FREDERICK RICHARD MATTHEWS, JR., INDIVIDUALLY AND AS THE EXECUTOR OF
    THE ESTATE OF FREDERICK RICHARD MATTHEWS, SR. v. LESLIE PRIDE
    JAMES, WILLIAM A. DAVIS, JR., AS HE IS GUARDIAN FOR THE BENEFIT OF
    COURTNEY SUZANNE PRIDE JAMES, AND BLUE BELL, INC., A DELA-
    WARE CORPORATION

No. 8718SC271

(Filed 15 December 1987)

1. Wills § 22— change of beneficiary—mental capacity—evidence sufficient for
   jury
        In an action alleging mental incapacity and undue influence in changing
   the beneficiary of a pension and profit sharing plan, plaintiff's evidence showed
   a history of mental illness and alcohol abuse sufficient to take the question of
   decedent's mental capacity to the jury.

2. Wills § 21.4— change of beneficiary—undue influence—evidence sufficient for
   jury
        In an action alleging undue influence in changing the beneficiary of a pen-
   sion and profit sharing plan, evidence supporting plaintiff's claim of undue in-
   fluence was sufficient to go to the jury where decedent was seventy-three
   years old when he executed the change of beneficiary forms; decedent was a
   chronic alcoholic and suffered from manic depression; decedent attempted to
   take his own life less than one month prior to the execution of the forms and
   did take his own life less than two weeks subsequent to execution of the
   forms; decedent had been subject to the constant association and supervision
   of defendant James for approximately two months prior to signing the forms;
   the person who cared for the decedent prior to the arrival of defendant James
   testified that decedent was not capable of taking care of himself; both that per-
   son and plaintiff's wife testified that at times the decedent could not use the
   bathroom unassisted and was unable to take care of his own personal hygiene;
   plaintiff saw the decedent only once during the time he resided with defendant
   James, and then in the company of defendant James; others were in contact
   with decedent but he was always accompanied by defendant James; decedent
   had originally designated his wife and son, the plaintiff, as beneficiary of the
   profit sharing and pension plan in 1969; decedent changed his designation of
   beneficiaries in 1984 to defendant James, who was his mother's sister's daugh-
   ter, and to defendant Davis as guardian for defendant James' daughter; de-
   fendant James had been living in California for twenty-six years and had last
   seen decedent prior to 1984 in 1958, when she was eighteen years old; plaintiff
   would receive none of the proceeds of decedent's Blue Bell plans under the
   beneficiary designations executed in 1984; all of the proceeds would be paid to
   defendant James and her daughter; and the new beneficiary designation was
   executed shortly after defendant James announced to decedent that she would
   be leaving decedent permanently instead of returning to care for him after a
   temporary stay in California.

Matthews v. James

**3. Wills §§ 21.3, 22.2— change of beneficiary—mental incapacity and undue influence—relevance of evidence**

   In an action alleging mental incapacity and undue influence in changing the beneficiary of a pension and profit sharing plan, evidence of plaintiff's relationship with his father, the decedent, prior to his wife's death was relevant in that it tended to show by contrast the decedent's growing irrationality during the last year of his life; evidence of the decedent's hospitalization for alcoholism and manic depression tended to show that the mental instability of the decedent was a recurring problem and allowed the inference that such a problem resurfaced in 1984; the evidence of decedent's competence in 1969 when he signed his original designation of beneficiaries was offered to contrast with decedent's condition in 1984 when he changed the designation and to show the progressive nature of his disorders; testimony as to decedent's drinking habits prior to the execution showed his growing dependence in his loss of physical and mental control; and questions regarding decedent's habits and attitudes toward his yard over the years were offered as a foundation for evidence that in 1984, without any apparent reason, decedent spent lavish amounts of money tending and improving his lawn and yard.

**4. Wills § 23— change of beneficiary—undue influence and mental incapacity—instructions on mental competence and suicide**

   In an action alleging mental incapacity and undue influence in changing the beneficiary of pension and profit sharing plans, the court's instructions properly stated the law applicable to the issue of mental incapacity, and defendants' requested instruction that the decedent's suicide could not be considered as evidence on the issue of mental capacity was contrary to the law of the State and was properly rejected by the trial judge.


APPEAL by defendant from *Morgan, Judge*. Judgment entered 2 July 1986 in Superior Court, GUILFORD County. Heard in the Court of Appeals 1 October 1987.

This is a civil action to rescind change of beneficiary designations executed by Frederick Richard Matthews, Sr. (hereinafter "decedent") on 20 September 1984 for his pension and profit sharing plans administered by his former employer, defendant Blue Bell, Inc. The grounds for rescission asserted in the complaint were breach of contract by defendant Leslie Pride James, lack of mental capacity on the part of decedent, and undue influence exerted by defendant James. After the jury answered the issues related to lack of mental capacity and undue influence in plaintiff's favor, the trial court entered judgment ordering defendant Blue Bell to pay the funds in decedent's accounts to plaintiff pursuant to the decedent's original designation of beneficiary for the plans executed in 1969. Defendant James and defendant

Davis, as guardian for the benefit of Courtney Suzanne Pride James, appeal.

*Beskind and Rudolf, P.A., by Heidi G. Chapman and Donald H. Beskind for plaintiff-appellee.*

*Haines, Short, Campbell and Ferguson by Forrest E. Campbell for defendant-appellants.*

PARKER, Judge.

On this appeal, defendants raise three assignments of error: (i) that the trial court erred in denying defendants' motions for directed verdict and for judgment notwithstanding the verdict; (ii) that the trial court erred in admitting evidence of the decedent's mental, emotional, and physical condition at a time remote from the change of beneficiary designations at issue in the case; and (iii) that the trial court erred in refusing to give jury instructions requested by defendants on the presumption of mental competence and the presumption against suicide. We find these assignments to be without merit and hold that there was no reversible error in the court below.

I.

[1]    The first question for consideration is whether the trial court erred in denying defendants' motions for directed verdict and for judgment notwithstanding the verdict based on insufficiency of the evidence to go to the jury on the issues of mental capacity and undue influence. In ruling on a motion for directed verdict, the trial judge must consider the evidence in the light most favorable to plaintiff, taking the evidence supporting plaintiff's claims as true, resolving all contradictions, conflicts, and inconsistencies in plaintiff's favor, and giving plaintiff the benefit of every reasonable inference. *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E. 2d 333, 337-338 (1985). A motion for judgment notwithstanding the verdict is essentially a renewal of the motion for directed verdict; therefore, if the motion for directed verdict could have been properly granted, the motion for judgment notwithstanding the verdict should be granted. *Id.* at 368-369, 329 S.E. 2d at 337. *See also Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E. 2d 678, 90 A.L.R. 3d 525 (1977).

Our Courts have set out the standard of competency to contract as follows:

[A] person has mental capacity sufficient to contract if he knows what he is about . . . and . . . the measure of capacity is the ability to understand the nature of the act in which he is engaged and its scope and effect, or its nature and consequences, not that he should be able to act wisely or discreetly, nor to drive a good bargain, but that he should be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly.

*Sprinkle v. Wellborn*, 140 N.C. 163, 181, 52 S.E. 666, 672 (1905) (citations omitted). *See also Ridings v. Ridings*, 55 N.C. App. 630, 633, 286 S.E. 2d 614, 616, *disc. rev. denied*, 305 N.C. 586, 292 S.E. 2d 571 (1982).

At trial, plaintiff presented evidence tending to show the following facts. The decedent was an alcoholic and a diagnosed manic depressive who had been hospitalized on a number of occasions for alcoholism and mental illness. In the year prior to his death, he became more difficult to control, especially after the deaths of his wife and his brother. The decedent's only surviving child, his son, the plaintiff, attempted to care for decedent in plaintiff's home in Chapel Hill, but the decedent insisted on returning to his own home in Greensboro. Ms. Patricia Little, a longtime friend of the family, tried to care for the decedent in his home, but after less than three weeks, she left the decedent. Ms. Little testified that at the time she stayed with and cared for decedent in late June and early July of 1984, the decedent did not have the mental capacity to appreciate or understand the nature or quality of his acts, to understand the nature of his property, to handle his financial affairs, or to care for himself. During this period, decedent made cash gifts of $3,000.00 to his neighbor. When Ms. Little left, plaintiff sought appointment of a guardian for his father through a petition to the court. In late July 1984, defendant James, cousin to decedent, accompanied by her daughter, Courtney Suzanne Pride James, came from California to stay with and care for the decedent. Plaintiff agreed to arrange for defendant James to receive some remuneration either from plaintiff or from the estate of the decedent if she would care for decedent for the rest of his natural life, and plaintiff said he would

consider dropping the guardianship proceedings. The parties also agreed that defendant James would return to California for approximately one month in order to sell her house and make arrangements for her permanent move to North Carolina.

During defendant James's stay in the home of the decedent, the decedent drank excessively on at least two occasions, and tried to commit suicide by drinking vodka on or about 28 August 1984. On 4 September 1984, unbeknownst to plaintiff, the decedent was adjudged to be competent by the Assistant Clerk of Superior Court based on the clerk's observations and on a letter from a psychiatrist. Some time in the middle of September, defendant James announced to the decedent that when she left for California at the beginning of October, she would not be returning. Subsequent to this announcement, on 20 September 1984, the decedent filled out beneficiary designation forms for his Blue Bell plans, changing the beneficiaries from his original designation, made in 1969, of his wife and son to defendants James and Davis, as guardian for the benefit of defendant James's daughter.

Defendant James and her daughter left for California on 1 October 1984. Ms. Hope Fields, who was to temporarily care for the decedent while defendant James was in California, arrived later that same day and learned from the decedent that he had eaten no solid food for ten days, that he had not been taking his medication, and that he had been drinking. On 8 October 1984, Ms. Fields returned to the decedent's home after running some errands and found the decedent slumped in his chair frothing at the mouth with his eyes rolled back. The decedent died that day from what was later determined to be a dosage of cyanide.

In addition to Ms. Little's testimony, plaintiff testified that in August of 1984, when he last saw his father alive, the decedent did not have sufficient mental capacity to handle his personal affairs, to care for himself, to handle his financial affairs, or to understand the nature and effects of his conduct. A psychiatrist testified that when the decedent was hospitalized in May of 1984, he did not have sufficient mental capacity to understand the nature and consequences of his conduct nor could he manage his personal affairs or handle his property. In response to a series of hypothetical questions posed by plaintiff's counsel, the psychiatrist gave his further opinion that the decedent continued to suf-

fer from manic depression, or "bi-polar disorder" through the time of his suicide on 8 October 1984.

Viewed in the light most favorable to plaintiff, plaintiff's evidence showed a history of mental illness and alcohol abuse and was sufficient to take the question of the decedent's mental capacity to contract to the jury. Although defendants presented evidence to the contrary, the jury could have reasonably concluded that on 20 September 1984 defendant lacked the requisite mental capacity to execute the change of beneficiary designation forms.

[2] In order to show undue influence in the execution of a document, a party must show that something operated on the mind of the person who was allegedly influenced that had "a controlling effect sufficient to destroy the person's free agency and to render the instrument not properly an expression of the person's wishes, but rather the expression of the wishes of another or others." *Hardee v. Hardee*, 309 N.C. 753, 756, 309 S.E. 2d 243, 245 (1983). Although there is no mathematical formula by which to ascertain whether there is sufficient evidence of undue influence to take the issue to the jury, several factors have a bearing on the question, including:

1. Old age and physical and mental weakness of the person executing the instrument.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the instrument is different and revokes a prior instrument.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*Id.* at 756-757, 309 S.E. 2d at 245. It must be remembered that " '[u]ndue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence.' " *Id.* at 757,

309 S.E. 2d at 246 (quoting *In re Will of Amelia Everett,* 153 N.C. 83, 87, 68 S.E. 924, 925 (1910)).

In the case before us, evidence supporting plaintiff's claim showed that at the time he executed the change of beneficiary forms, the decedent was seventy-three years old, he was a chronic alcoholic, and he suffered from "bi-polar disorder," or manic-depression. Less than one month prior to the execution of the forms, the decedent attempted to take his own life; less than two weeks subsequent to execution of the forms, the decedent did take his own life. Although the decedent was in his own home, he had been subject to the constant association and supervision of defendant James for approximately two months prior to his signing the forms. Ms. Little, who cared for the decedent prior to the arrival of defendant James, testified that the decedent was not capable of taking care of himself. Both plaintiff's wife and Ms. Little testified that at times the decedent could not use the bathroom unassisted and was unable to take care of his own personal hygiene. During the time that defendant James resided with the decedent, plaintiff saw the decedent only once, and then in the company of defendant James. Although others were in contact with the decedent, he was always accompanied by defendant James.

The decedent originally designated his wife and son, the plaintiff, as beneficiaries of the Blue Bell plans in 1969. On 20 September 1984, the decedent changed his designation of beneficiaries to defendant James, who was the decedent's mother's sister's daughter, and to defendant Davis as guardian for defendant James's daughter. Defendant James had been living in California for the past twenty-six years, and the last time she had seen the decedent prior to 1984 was in 1958, when she was eighteen years old. Under the beneficiary designations executed on 20 September 1984, the decedent's son, plaintiff, would receive none of the proceeds of the decedent's Blue Bell plans; all of those proceeds would be paid to the decedent's cousin, defendant James, and her daughter. The new beneficiary designation was executed shortly after defendant James announced to the decedent that instead of returning to care for the decedent after a temporary stay in California, she would be leaving the decedent permanently.

The foregoing evidence is sufficient to permit the jury reasonably to infer that defendant James procured the 20 September 1984 change of beneficiary designations by means of undue influence. Defendants' first assignment of error is overruled.

## II.

[3] Defendants' second assignment of error involves twenty-eight excepted-to portions of testimony involving the mental, emotional, and physical condition of the decedent prior to his execution of the change of beneficiary forms on 20 September 1984. Specifically, defendants objected to questions regarding the relationship between the decedent and his son, the plaintiff, in the period prior to the death of the decedent's wife in early 1984; to questions in reference to the decedent's hospitalization for alcoholism and mental illness in 1970 and 1973; to questions regarding the decedent's mental capacity in 1969 when he signed the original designations of beneficiaries for his Blue Bell plans; to questions relating to the decedent's drinking habits over the years; and to questions inquiring as to the decedent's yard work during the time he lived in Greensboro. Defendants object to these areas of inquiry on the basis of relevance, arguing that the events inquired of are too remote to be relevant to the issues in the case, and that any relevance they might have is outweighed by unfair prejudice to defendants. We disagree with this contention.

Our Rules of Evidence define relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." G.S. 8C-1, Rule 401. In general, all relevant evidence is admissible, G.S. 8C-1, Rule 402; however, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." G.S. 8C-1, Rule 403. Whether or not to exclude evidence under this latter rule is a decision within the discretion of the trial judge. *State v. Mason*, 315 N.C. 724, 731, 340 S.E. 2d 430, 435 (1986).

We note at the outset that all evidence favorable to plaintiff will be, by definition, prejudicial to defendants. The test under Rule 403 is whether that prejudice to defendants is unfair. We

find that in each case, the evidence objected to by defendants was relevant and not unfairly prejudicial to defendants.

Although the mental capacity of the decedent to change the beneficiaries of his Blue Bell plans must be determined as of the date of the execution of the forms effecting such change, evidence of the decedent's mental capacity at other times is admissible if it bears on the issue of the decedent's mental capacity at the time he executed the changes. *See In re Daniels*, 67 N.C. App. 533, 535, 313 S.E. 2d 269, 271, *disc. rev. denied*, 311 N.C. 756, 321 S.E. 2d 159 (1984). " 'Evidence of mental condition before and after the critical time is admissible, provided it is not too remote to justify an inference that the same condition existed at the latter time.' " *Id.* at 535, 313 S.E. 2d at 271 (quoting 1 Brandis on North Carolina Evidence § 127 (1982) ). Whether or not such evidence is too remote depends on the circumstances of the case interpreted by "the rule of reason and common sense." *In re Will of Hargrove*, 206 N.C. 307, 312, 173 S.E. 577, 579-580 (1934). *See also In re Daniels, supra.* Moreover, undue influence is necessarily proved by a multitude of facts and circumstances surrounding the execution of the document that might suggest the existence of undue influence. *See Hardee v. Hardee, supra.*

Alcoholism and mental illness are conditions that are often progressively debilitating. While evidence of a party's mental or physical condition at a time remote from the execution of a document is generally not admissible, where that party has a progressive degenerative illness, evidence of the party's condition some years prior to and after the date of execution may be admissible to show the onset of the disorder and the gradual deterioration of the party's mind and will. *Compare In re Will of Hargrove, supra* (evidence of mental capacity two to twenty years after execution of will held inadmissible where there was no evidence of progressive mental impairment) *with Moore v. Insurance Co.*, 266 N.C. 440, 146 S.E. 2d 492 (1966) (evidence of chronic alcoholism before and after surrender of life insurance policy held admissible) *and In re Daniels, supra* (evidence of mental deterioration due to arteriosclerosis up to nine years prior to execution of will held admissible). *See also Ashley v. Delp*, 59 N.C. App. 608, 297 S.E. 2d 905 (1982), *disc. rev. denied*, 308 N.C. 190, 302 S.E. 2d 242 (1983) (evidence of mental capacity eight years prior to and three years

after execution of deed held admissible where mental deficiency is ongoing condition).

Evidence of plaintiff's relationship with his father, the decedent, prior to his wife's death in the winter of 1984 is relevant in that it tends to show by contrast the decedent's growing irrationality during the last year of his life. Evidence of the decedent's hospitalization for alcoholism and manic depression tends to show that the mental instability of the decedent was a recurring problem and allows the inference that such a problem resurfaced in 1984. The evidence of the decedent's competence in 1969 when he signed his original designation of beneficiaries was offered to contrast with the decedent's condition in 1984 when he changed the designation, and again, to show the progressive nature of his disorders. Testimony as to the decedent's drinking habits in the twenty years prior to the execution also shows his growing dependency and his loss of physical and mental control. Finally, questions posed by plaintiff's counsel regarding the decedent's habits and attitudes toward his yard over the years were offered as a foundation for evidence that in the spring and summer of 1984, without any apparent reason, the decedent spent lavish amounts of money tending and improving his lawn and yard. This evidence is admissible in that it tends to show the decedent's growing lack of mental capacity culminating in his signing of the change of beneficiary forms on 20 September 1984.

The foregoing evidence was clearly relevant and admissible to show the decedent's mental incapacity and the exercise of undue influence on him on or about 20 September 1984. Defendants' second assignment of error is overruled.

III.

[4] Defendants' third and final assignment of error is based on the trial court's refusal in instructing the jury to include the language of two statements requested by defendants concerning mental competency and suicide.

Defendants requested the following instruction concerning mental capacity:

There is a presumption that the Testator, Frederick Matthews, Sr., possessed sufficient mental capacity to execute a valid change of beneficiary in the absence of evidence

to the contrary. Therefore, on this issue, the burden of proof is on the Plaintiffs to overcome the presumption of mental capacity and to prove, by the greater weight of the evidence, that Frederick Matthews, Sr. did not have sufficient mental capacity to make a change of beneficiary on his Blue Bell accounts.

Defendants also requested the following instruction as to the evidence of the decedent's suicide on 8 October 1984:

The mere fact that there is some evidence that Frederick Matthews, Sr. may have committed suicide is not to be considered as any evidence of his mental capacity on September 20, 1984 when he executed the Beneficiary Changes.

At trial, the court instructed the jury, "The burden of proof . . . is upon the Plaintiff, F. R. Matthews, Jr., to satisfy you by the greater weight of the evidence that Frederick Richard Matthews, Sr., did not have sufficient mental capacity to enter into a change of beneficiary on September 20, 1984." The trial court also instructed the jury as follows:

A person does not have the mental capacity to change a beneficiary if at the time in question he did not know what he was doing or did not understand the consequences of his act. It makes no difference what caused the lack of capacity if it in fact existed. It is the actual state or condition of the mind itself which controls and not the causes of that condition. However, to have sufficient capacity it was not necessary that he have the capacity to act wisely or discretely [sic] so long as he knew what he was doing and understood the consequences.

. . . .

In this case, members of the jury, there is some evidence tending to show that Frederick Richard Matthews, Sr., attempted to commit suicide on one occasion and died by suicide on another. As regard to this evidence, I instruct you that the lack of mental capacity is not established by the mere fact that Frederick Richard Matthews, Sr., attempted to commit suicide or committed suicide. There is a presumption in law that every person is mentally normal. The evi-

dence of suicide alone is not sufficient to overcome the presumption of mental normalcy, but it is evidence to be considered by you together with all of the other evidence in the case in determining whether Frederick Richard Matthews, Sr., had sufficient mental capacity to change the beneficiary on his Blue Bell plans at the time he signed the beneficiary designation forms on September 20, 1984.

Defendants' tendered statement regarding mental capacity was taken, nearly verbatim, from the North Carolina Civil Patterned Jury Instructions, Section 860.15, on testamentary capacity. The judge's instructions as to plaintiff's burden of showing mental incapacity were taken from the North Carolina Civil Patterned Jury Instructions, Section 505.40, concerning "Rescission of Written Instrument—Mental Incapacity," and accurately state the law as to plaintiff's burden of proof. That a party seeking to avoid a contract has the burden of proof on the question of mental capacity is undisputed, and "Everyone is presumed to be sane until the contrary appears." *Ridings v. Ridings*, 55 N.C. App. at 633, 286 S.E. 2d at 616 (citing 2 Stansbury's N.C. Evidence § 238 (Brandis rev. 1973)). In his instructions the trial judge included the statement, "There is a presumption in law that every person is mentally normal." These instructions properly stated the law applicable to the issue of mental capacity in this case. "The court is not required to charge the jury in the precise language requested so long as the substance of the request is included." *Love v. Pressley*, 34 N.C. App. 503, 513, 239 S.E. 2d 574, 581 (1977), *disc. rev. denied*, 294 N.C. 441, 241 S.E. 2d 843 (1978).

Defendants' requested instruction that the decedent's suicide may not be considered as any evidence on the issue of mental capacity is contrary to the law of this State and was properly rejected by the trial judge. Evidence of a party's suicide or attempted suicide may be considered as some evidence of his capacity to enter into a contract. Defendants' third and final assignment of error is overruled.

Therefore, for the reasons stated above, we find

No error.

Judges BECTON and JOHNSON concur.