STATE OF NORTH CAROLINA
v.
JAMES EDWARD DOWNEY, Defendant.
No. COA09-61.
Court of Appeals of North Carolina
Filed October 20, 2009
This case not for publication
Attorney General Roy Cooper, III, by Assistant Attorney General Yvonne B. Ricci, for the State.
Parish, Cooke & Condlin, by James R. Parish, for defendant-appellant.
ROBERT C. HUNTER, Judge.
James Edward Downey ("defendant") was arrested and indicted on the following counts: (1) first degree statutory rape of a minor under the age of 13; (2) taking indecent liberties with a child; and (3) first degree statutory sexual offense. Each count was alleged to have taken place between 2 November 2001 and 31 January 2002 when the minor victim, B.P., was 8 years old.[1] The trial in this matter began in the Superior Court of Rowan County on 19 May 2008, and defendant was found guilty of all charges on 27 May 2008. Defendant was sentenced to two consecutive sentences of 240 to 297 months imprisonment for the first degree rape and first degree sexual offense convictions, and 16 to 20 months imprisonment for the indecent liberties with a child conviction. The trial court also ordered defendant to submit to lifetime satellite-based monitoring. After careful review, we find no error.

Background
The evidence at trial tended to show that defendant began residing in the home of his cousin, B.P.'s mother, in early November 2001.[2] Defendant testified that his intention was to live there for "only a couple of months" because he was "trying to save up money for a place." On 9 November 2001, B.P. turned 8 years old. Defendant was 28 years old at the time.
B.P. testified that defendant slept in her bedroom on the bottom level of her bunk bed while she slept on the top level. Defendant testified that he slept in B.P.'s room for only a week or less because he was bothered by the light that B.P. left on during the night. After defendant complained about the light, B.P. switched bedrooms with her brother, at which point B.P. and defendant no longer slept in the same room.
B.P. testified that one day she was sick, and defendant told her to ask her mother if she could sleep on the bottom level of the bunk bed with defendant. B.P. testified that she did ask her mother, and though it is unclear what her mother's response was, B.P. did sleep with defendant. B.P. testified that at some point, she awoke, and defendant was having sexual intercourse with her, having removed her pants and underwear. She stated in court: "He raped me. He put his penis inside me." B.P. further testified that at various times during his stay at her home, defendant "would just touch on [her] in not appropriate places." Specifically, B.P. stated that defendant digitally penetrated her vagina on multiple occasions. B.P. stated that defendant never told her not to tell anyone about these instances, but she chose not to tell anyone because she "was scared of [defendant], and [she] was scared of what was going to happen if [she] did tell." Defendant moved out of B.P.'s home in January 2002.
In March 2005, B.P. spent the evening at her friend Vickie's house. B.P. watched a movie with Vickie and her mother, Wendy Martinez ("Martinez"). The movie contained sexual content, and Martinez asked the two girls if they "`had been messed with.'" At first B.P. said no, but after Martinez repeated the question, B.P. divulged that she had been "messed with by [her] mama's cousin." Martinez then called A.P. and told her what B.P. had revealed.
In May 2005, B.P. was physically examined once and interviewed twice by Dr. Kathleen Russo ("Dr. Russo"), a pediatrician who is also credentialed through the University of North Carolina Department of Pediatrics as a child abuse expert. Dr. Russo testified that her physical examination of B.P. revealed a bump and a notch on B.P.'s hymen, which is typically seen when the hymen has been penetrated or traumatized. She further stated that the physical findings from B.P.'s examination were consistent with penile or digital penetration. At the first interview, B.P. told Dr. Russo that defendant had digitally penetrated her, performed cunnilingus on her, and at times had asked her to grope his penis. During the second interview, B.P. revealed that defendant had also had sex with her.
At trial, another minor female, H.C.[3], testified that defendant molested her for three years while he was married to her mother and resided with them in Virginia.[4] H.C., who was sixteen at the time of trial, claimed that defendant had sexual intercourse with her multiple times from the time she was six years old until she was nine. H.C. testified that defendant also groped her breasts, kissed her, and performed cunnilingus on her. She stated that she would often awake with defendant on top of her, having intercourse with her. H.C. testified that defendant told her that she should not tell anyone about these incidents because it was their secret. H.C. claimed that she was afraid that if she told anyone defendant would kill her or take her away from her family. H.C. eventually told her father about defendant's actions. Pediatric Nurse Practitioner Beverly Hoeing testified at trial that she examined H.C. and found "an annular hymen" and a moderate amount of vaginal discharge, which was consistent with H.C.'s disclosure of sexual abuse.
Defendant testified at trial and denied the allegations of B.P. and H.C.

Analysis

I.
Defendant argues that H.C.'s testimony amounted to inadmissible character evidence under N.C. Gen. Stat. § 8C-1, Rule 404(b) (2007) and that the prejudicial effect of H.C.'s testimony outweighed its probative value under N.C. Gen. Stat. § 8C-1, Rule 403 (2007). Specifically, defendant claims that the acts to which H.C. testified were not sufficiently similar to those alleged by B.P., and thus, H.C.'s testimony was not properly admitted under Rule 404(b). Defendant further claims that the trial court erred in allowing H.C. to testify regarding prior sexual abuse when the charges that stemmed from those allegations were dismissed.
We review a trial court's decision to admit evidence under Rules 404 and 403 for an abuse of discretion. State v. Summers, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907 (2006). "An abuse of discretion occurs when a trial judge's ruling is `manifestly unsupported by reason.'" Id. (quoting State v. Riddick, 315 N.C. 749, 756, 340 S.E.2d 55, 59 (1986)).
Rule 404 of the North Carolina Rules of Evidence states in pertinent part:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.
N.C. Gen. Stat. § 8C-1, Rule 404(b). Our Supreme Court has held that Rule 404(b) "`is a clear general rule of inclusion of relevant evidence . . . subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.'" State v. Golphin, 352 N.C. 364, 443, 533 S.E.2d 168, 221 (2000) (quoting State v. Coffey, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990)), cert. denied, 532 U.S. 931, 121 S. Ct. 1380, 149 L. Ed. 2d 305 (2001).
Our Courts have "been markedly liberal in admitting evidence of similar sex offenses by a defendant for the purposes now enumerated in Rule 404(b) . . . ." State v. Cotton, 318 N.C. 663, 666, 351 S.E.2d 277, 279 (1987). "Such evidence is admissible unless the other offense[s] were not sufficiently similar or were too remote in time from the commission of the offense charged." Id. In admitting evidence of similar acts, the "[s]imilarities need not be bizarre or uncanny; they simply must `tend to support a reasonable inference that the same person committed both the earlier and later acts.'" State v. Murillo, 349 N.C. 573, 593, 509 S.E.2d 752, 764 (1998) (quoting State v. Stager, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991)), cert denied, 528 U.S. 838, 120 S. Ct. 103, 145 L. Ed. 2d 87 (1999).
"`Once the trial court determines evidence is properly admissible under Rule 404(b), it must still determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice' under Rule 403." Summers, 177 N.C. App. at 697, 629 S.E.2d at 907 (quoting State v. Bidgood, 144 N.C. App. 267, 272, 550 S.E.2d 198, 202 (2001)). "In construing this rule, we have said, `all evidence favorable to the [State] will be, by definition, prejudicial to defendants. The test under Rule 403 is whether that prejudice to defendants is unfair.'" Id. (quoting Matthews v. James, 88 N.C. App. 32, 39, 362 S.E.2d 594, 599 (1987)). "The term `unfair prejudice' means `an undue tendency to suggest decision on an improper basis[.]'" Id. (quoting State v. DeLeonardo, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986)).
In the present case, after conducting a voir dire of H.C. and hearing arguments by counsel, the trial court stated:
The Court would find that with regard to [H.C.'s] alleged acts that she complained of, and [B.P.'s] complained acts, the Court makes, again, the following findings: Number one, the Court notes there's a similarity between the ages of the victims . . . at the time of the alleged acts committed by the defendant.
Number two, the Court notes a similarity of the victims's placement with the defendant, because of familial or quasi familial relationships.
Next finding. The defendant's purported modus operandi in each instance.
Next finding. The fact that the defendant was able to convince each victim by his word or his actions not to report the acts.
Next finding. That each victim complained of similar acts by the defendant that took place in similar locations.
Next finding. The Court also finds there's a similarity of injuries suffered by both victims in this case. The Court would further find that the last act against [H.C.] took place approximately 1.5 years before the first act against [B.P.] The Court finds that the time issue in this case is not too remote, or that the prior alleged bad acts committed against [H.C.] are not too remote in time to render the evidence irrelevant or otherwise inadmissible.
The Court would find that the proffered reason for admitting this evidence under Rule 404(b) by the State, in this case is appropriate, and is not being offered to show action in conformity therewith, but instead the Court will accept this evidence solely for the purpose of showing that there existed in the mind of the defendant a plan, scheme, or system, or design involving the crime charged in this case . . . .
. . . .
[T]he court has also carefully considered Rule 403. And the Court finds that the alleged prior bad acts of the defendant, the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.
Prior to H.C.'s testimony, the trial court instructed the jury that the evidence was only being admitted "for the purpose of showing that there existed in the mind of the defendant a plan, scheme, or system or design involving the crime charged in this case."
Based on the evidence presented, we note that the following similarities were present in the minors' testimonies: (1) the minors were close in age when the acts occurred; (2) both girls were afraid to divulge the sexual abuse (B.P. was afraid of defendant, though he did not tell her to keep his actions secret, and H.C. claimed that she was afraid of defendant and that he specifically told her to remain quiet); (3) both children claimed that defendant engaged in sexual intercourse, digital penetration, and cunnilingus with them in their respective homes; (4) both girls testified that they awoke to find defendant having sexual intercourse with them; (5) both girls suffered similar sexual injuries; and (6) there was a familial or quasi familial relationship between defendant and both girls. While defendant points to various dissimilarities between H.C.'s and B.P.'s testimonies, we find that the similarities "tend to support a reasonable inference that the same person committed both the earlier and later acts." Stager, 329 N.C. at 304, 406 S.E.2d at 891.
The case of State v. Bradley, 179 N.C. App. 551, 634 S.E.2d 258 (2006) is similar to the case sub judice. There, "all three of the 404(b) witnesses were young female relatives who were in the care of defendant at the time of the alleged abuse. Each testified to similar acts by defendant in similar locations, followed by defendant's instruction to keep the encounters a secret." Id. at 560, 634 S.E.2d at 264. This Court held:
Given the similarity between the ages of the victims at the time of the acts, their placement with the defendant because of familial or quasi-familial relationships, the defendant's purported modus operandi in each instance, and the warning he allegedly gave each victim, we conclude the evidence was properly admitted pursuant to Rule 404(b).
Id. While defendant in this case did not warn B.P. to keep his actions secret, we nonetheless find this case to be analogous in most respects to Bradley.
Thus, based on the evidence presented, we find that the trial court did not abuse its discretion in admitting H.C.'s testimony pursuant to Rule 404(b), as there were sufficient similarities between the minors' allegations, and the acts testified to allegedly took place in close temporal proximity.
Defendant also claims that the charges against him in Virginia pertaining to H.C.'s allegations were dismissed, and therefore, those allegations cannot be raised at a later trial pursuant to Rule 403.[5] Defendant points to the case of State v. Scott, 331 N.C. 39, 413 S.E.2d 787 (1992). In Scott, our Supreme Court held:
We conclude that evidence that defendant committed a prior alleged offense for which he has been tried and acquitted may not be admitted in a subsequent trial for a different offense when its probative value depends, as it did here, upon the proposition that defendant in fact committed the prior crime. To admit such evidence violates, as a matter of law, Evidence Rule 403.
Id. at 42, 413 S.E.2d at 788. Thus, under Scott, where a defendant has been acquitted of a prior charge, the trial court lacks the discretion to admit the 404(b) evidence because the evidence is unfairly prejudicial as a matter of law. See id.
The Supreme Court later explained that the holding in Scott was based "on the proposition that the presumption of innocence continues with the defendant after his acquittal and so erodes the probative value of the evidence of the previous crime that it is more prejudicial than probative, making it inadmissible under . .. Rule 403." State v. Lynch, 337 N.C. 415, 419, 445 S.E.2d 581, 582 (1994). In Lynch, the Court distinguished Scott and held that where charges are dismissed, "[t]he State may proceed against the defendant on the previous charge and he is not entitled to the protection provided by Scott." Id. (noting that the charges against the defendant were dismissed because the trial court found a lack of probable cause for the arrest).
In the more recent case of State v. Campbell, 142 N.C. App. 145, 149, 541 S.E.2d 803, 805 (2001), this Court allowed 404(b) evidence of a prior bad act where the charges against the defendant had been dismissed, noting, "a voluntary dismissal of a criminal charge does not prevent the State from obtaining a new indictment based on the same acts."
Defendant's reliance on Scott is misplaced since he was never acquitted by a jury of any charges pertaining to H.C.'s allegations, and the State was not prohibited from proceeding with charges against him. Therefore, the probative value of H.C.'s testimony was not eroded by a presumption of innocence that follows an acquittal. The present case is more analogous to Lynch and Campbell than to Scott. Accordingly, defendant's argument that H.C.'s testimony was inadmissible because the charges against him in Virginia were dismissed is without merit. Defendant makes no other assertions regarding unfair prejudice under Rule 403.
In sum, we find that the trial court did not err in admitting H.C.'s testimony under Rule 404(b), and the evidence was not unfairly prejudicial pursuant to Rule 403.

II.
Next, defendant argues that the trial court erred in denying defendant's motion to dismiss all of the charges against him because the evidence presented did not establish that the crimes took place between 2 November 2001 and 31 January 2002 as alleged in the indictments. This argument is without merit. With regard to child sexual offenses,
[t]his Court has previously held that "`the date given in the bill of indictment is not an essential element of the crime charged and the fact that the crime was in fact committed on some other date is not fatal.'" Further, we have recognized a "[j]udicial tolerance of variance between the dates alleged and the dates proved" in cases involving child sexual abuse. "Unless a defendant demonstrates that he was deprived of the opportunity to present an adequate defense due to the temporal variance, the policy of leniency governs."
State v. Brown, 178 N.C. App. 189, 195, 631 S.E.2d 49, 53 (2006) (quoting State v. Burton, 114 N.C. App. 610, 612-13, 442 S.E.2d 384, 386 (1994)) (citation omitted). Our Courts have acknowledged that "`in the interests of justice and recognizing that young children cannot be expected to be exact regarding times and dates, a child's uncertainty as to time or date upon which the offense charged was committed goes to the weight rather than the admissibility of the evidence.'" State v. McGriff, 151 N.C. App. 631, 635, 566 S.E.2d 776, 779 (2002) (quoting State v. Wood, 311 N.C. 739, 742, 319 S.E.2d 247, 249 (1984)).
Here, B.P. testified that she lived in Salisbury, North Carolina when she was "[s]even or eight years old." She further testified that defendant moved into her home in Salisbury when she was eight. The record shows that B.P. turned eight on 9 November 2001. B.P. testified that the alleged sexual acts perpetrated by defendant took place while he was living in her home and that he lived there for approximately two months in 2001 and 2002. A.P. testified that defendant lived in her home with B.P. for two months in 2001 and 2002. Defendant admitted that he moved into B.P.'s home in "the fall into winter" of 2001 and that he planned on living there for only a few months.
Based on the evidence presented, we find that there was sufficient evidence to show that the crimes took place between 2 November 2001 and 31 January 2002 when defendant was living in B.P.'s home. The lack of specific dates and times of the sexual acts does not constitute a fatal variance in this case. Furthermore, defendant has not established how the alleged variance affected his defense, and therefore, the policy of leniency governs. Brown, 178 N.C. App. at 195, 631 S.E.2d at 53.

III.
Next, defendant argues that the trial court erred by not allowing the defendant's expert, Dr. John Warren ("Dr. Warren"), a forensic psychologist and physician's assistant, to testify regarding the proper interviewing techniques to be utilized by health care providers when interviewing alleged victims of child sexual abuse.
Rule 702 states in pertinent part:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.
N.C. Gen. Stat. § 8C-1, Rule 702(a) (2007). Our Supreme Court has interpreted this rule and held:
"Expert testimony is properly admissible when it can assist the jury in drawing certain inferences from facts and the expert is better qualified than the jury to draw such inferences." In applying the rule, the trial court is afforded wide discretion and will be reversed only for an abuse of that discretion. Further, under Rule 403 even relevant evidence may properly be excluded by the trial court if its probative value is outweighed by the danger that it would confuse the issues before the court or mislead the jury. Whether to exclude expert testimony for this reason also rests within the sound discretion of the trial court, which will be reversed only for an abuse of discretion.
State v. Anderson, 322 N.C. 22, 28, 366 S.E.2d 459, 463 (quoting State v. Evangelista, 319 N.C. 152, 163, 353 S.E.2d 375, 383 (1987)) (citations omitted), cert. denied, 488 U.S. 975, 109 S. Ct. 513, 102 L. Ed. 2d 548 (1988); accord State v. Mackey, 352 N.C. 650, 657, 535 S.E.2d 555, 558-59 (2000).
Dr. Warren's proffered testimony during voir dire was as follows:
Q Can you tell us about  anything about, under the realm of forensic psychology, anything about false or inaccurate allegations of child sexual abuse? Can you tell us anything about that?
. . . .
A They're not common, but they're not uncommon. In other words, there's some schools of thought that these allegations, whenever they come up, must be true. When in fact while not common, they are not uncommon.. . . There's also important information in terms of the number and type [of interviews], and who does the interviewing of children, and what kind of interviews that you do with children. Interview to maintain and preserve accuracy must take into account the child's development level; the number of prior interviews; the demand characteristics of the interviewer; the presence and/or absence of leading questions; the presence and/or absence of repetitive questions.
Q You got a chance to look at the interview for [B.P.], I mean the medical exam from [B.P.]; correct?
A I did.
. . . .
Q Now, does it appear that there's two interviews here in this paragraph, two separate interviews that took place on the child?
A Yes.
Q Okay. It appears that there's one interview, then an exam, then an additional interview; right?
A It does.
Q Okay. Is that normal standard procedure? Is there such a thing as standard procedure I guess I should ask?
A I would not say this is unusual. The standard procedure is to use care about repetitive or leading or demand characteristics of the interviewer.
Q What's the demand characteristics?
A That's where the interviewer by tone of voice, body language, type of question, eye contact, is providing a demand, telegraphing a demand to the person who's being interviewed about how they should answer.
Q Hypothetically speaking, if a child witness were to describe sex acts without describing penile intercourse into the vagina, okay, and an expert were to review just the child, were to examine the child, and then come back and say, "Tell me the story again, I have findings," what's your opinion of that?
A I think it is fraught with concern. It would depend on, in your hypothetical, the level of physical findings. I mean, if there were clear evidence of major trauma . . . then it may well be appropriate that a child who is otherwise nonverbal or didn't want to talk about something to say, hey, looks like something more has happened.
Q As far as [B.P.'s] actual report you've read and all, okay, in this paragraph she says no penile penetration in the first part. Doctor comes back and prompts more information, and then she says she's been penetrated two times. . . . If that same child were to take the stand at trial and say, "No, I was only penetrated one time," what would that be suggestive of?
A A difference in report between two episodes, a different or inaccurate recording in the child medical exam. Those would be the hypothesis I would have.
Q What if the physician testified that there was no inaccurate reporting, that the child said two times was raped two times [sic] after she came back out and said, "tell me more, I have findings"?
A Are you talking about this specific case?
Q This specific case. This is the paragraph in front of you.
A Well, as you know, because of my earlier discussion, you know, I had seen Detective Barnhart's interviews with this child before, where there was no indication of penile or other vaginal penetration of the penis . . . and that's what the child said here. And the child had previously been interviewed or talked to about this by Wendy Martinez, as well as the child's mother prior to ever talking to Barnhart, which happened prior to talking to the doctor. And, so, that's one of the cautions about interviewing children; there's more attention paid. There's a lot of learning through interviewing that occurs. And, so, then when there are discrepancies that may be meaningful  number of times of penile vaginal penetration  it is important, but it's neither positive or dispositive; it's just something that would be important to note.
Q And doesn't it make the information suspect when you see changes like that?
A It makes someone with my training concerned about the type of interviewing and interrogation, and the number of those; the issue about suspect or veracity or not is not my job, and really shouldn't be the job of any medical or psychological professional.
The trial court found that Dr. Warren's testimony improperly addressed the credibility of the victim. The trial court also found that, "[w]ith regard to the interviewing techniques . . . Dr. Warren's testimony would be no more helpful to the jury. The jury can make their own assessments by way of questions asked on cross-examination." Furthermore, the trial court stated that Dr. Warren's testimony about interviewing techniques would be "speculation and guesswork" and would be more prejudicial than probative under Rule 403.
Based on the voir dire testimony of Dr. Warren, we find that the trial court did not abuse its discretion in excluding the portions of Dr. Warren's testimony pertaining to the interviewing techniques of Dr. Russo because not only would his testimony have been speculative and unhelpful to the jury, Dr. Warren clearly made statements pertaining to B.P.'s credibility based on her inconsistent statements regarding penile penetration. Though Dr. Warren was prepared to testify concerning "demand characteristics," he was not present for Dr. Russo's interview, and there was no video recording available for him to observe her interview techniques. The only information Dr. Warren was privy to was the report that showed two interviews and two different statements from B.P. regarding sexual abuse. The jury was also privy to this information, and any testimony by Dr. Warren regarding "tone of voice, body language, type of question, [and] eye contact" would have been speculative and unduly prejudicial in that it would indicate a suspicion on his part that Dr. Russo influenced B.P.'s statements. The jury heard the testimony of Dr. Russo and B.P.; they were aware of the inconsistencies in B.P.'s statements and were able to draw their own conclusions regarding credibility.
In sum, we find that the trial court did not abuse its discretion in excluding Dr. Warren's testimony on the grounds that it would be unhelpful to the jury and would be unduly prejudicial.

IV.
Defendant was ordered to submit to lifetime satellite-based monitoring ("SBM") by the trial court. Defendant argues on appeal that this order violated the ex post facto provision of the United States Constitution because the crimes for which he was convicted took place before the legislation permitting SBM was passed in 2006. Since the appeal in this case, this Court has held that the "legislature intended SBM to be a civil and regulatory scheme." State v. Bare, __ N.C. App. __, __, 677 S.E.2d 518, 524 (2009). The Court in Bare stated:
We hold that the restrictions imposed by the SBM provisions do not negate the legislature's expressed civil intent. Defendant has failed to show that the effects of SBM are sufficiently punitive to transform the civil remedy into criminal punishment. Based on the record before us, retroactive application of the SBM provisions do not violate the ex post facto clause.
Id. at __, 677 S.E.2d at 531.
Accordingly, we hold that the imposition of SBM did not violate the ex post facto clause in the case before us. Defendant's argument is without merit.

Conclusion
Based on the foregoing, we hold that the trial court did not err in admitting H.C.'s testimony regarding prior bad acts of defendant under Rule 404(b) or Rule 403; there was not a fatal variance between the indictments and the evidence presented at trial; the trial court did not abuse its discretion in excluding portions of Dr. Warren's testimony; and the imposition of SBM did not violate the ex post facto clause of the United States Constitution pursuant to Bare.
No Error.
Judges STEELMAN and GEER concur.
Report per Rule 30(e).
NOTES
[1] Because the victim in this case is a minor, only her initials will be used.
[2] B.P.'s mother will hereinafter be referred to as A.P.
[3] Because H.C. is a minor, only her initials will be used in this opinion.
[4] The record indicates that the molestation would have taken place from 1997 until 2000.
[5] It is unclear from the record what charges were brought against defendant in connection with H.C.'s allegations. It is also unclear why the charges were dismissed, though defense counsel asserted at trial that the charges were dismissed because H.C. "recanted her statement regarding the defendant." The record does reveal that there were charges against defendant and that these charges were dismissed by the State.