STATE OF NORTH CAROLINA v. KENNEY BOWDITCH,
KENNETH EDWARD PLEMMONS, AND MARK ALLEN WATERS

No. 448PA09

(Filed 8 October 2010)

**Constitutional Law— ex post facto—satellite monitoring— sexual offenders—offense committed before program effective**

Subjecting sexual offenders to the satellite-based monitoring program (SBM) does not violate the *ex post facto* clauses of the state or federal constitution where the offenses occurred before the SBM statutes took effect. SBM has the nonpunitive objective of being a regulatory tool against an unacceptable threat to public safety. Examining the relevant factors from *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, neither the purpose nor the effect of the program negates the legislature's civil intent. The trial court was reversed.

Justice HUDSON dissenting.

Chief Justice PARKER and Justice TIMMONS-GOODSON join in this dissenting opinion.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of a memorandum and order entered 12 June 2009 by Judge Dennis J. Winner in Superior Court, Buncombe County, allowing defendants' motions to dismiss petitions filed by the State to enforce satellite monitoring provisions on defendants. Heard in the Supreme Court 10 May 2010.

*Roy Cooper, Attorney General, by Joseph Finarelli, Assistant Attorney General, for the State-appellant.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellee Kenneth Plemmons; Paul F. Herzog for defendant-appellee Kenney Bowditch; and Rhonda K. Moorefield for defendant-appellee Mark Waters.*

BRADY, Justice.

In 2006 the North Carolina General Assembly ratified "An Act To Protect North Carolina's Children/Sex Offender Law Changes" direct-

ing the Department of Correction (DOC) to establish a continuous satellite-based monitoring ("SBM") program for certain classes of sex offenders. An Act To Protect North Carolina's Children/Sex Offender Law Changes, ch. 247, sec. 15, 2006 N.C. Sess. Laws 1065, 1074-79 (codified as amended at N.C.G.S. §§ 14-208.40 to -208.45 (2009)). Defendants Kenney Bowditch, Kenneth Edward Plemmons, and Mark Allen Waters have each pleaded guilty to multiple counts of taking indecent liberties with a child. All of these offenses occurred before the SBM statutes took effect on 16 August 2006. Defendants dispute their eligibility for SBM, arguing that their participation would violate guarantees against ex post facto laws contained in the federal and state constitutions. We hold that the SBM program at issue was not intended to be criminal punishment and is not punitive in purpose or effect. Thus, subjecting defendants to the SBM program does not violate constitutional prohibitions against ex post facto laws.

## PROCEDURAL BACKGROUND

Defendant Plemmons pleaded guilty on 1 November 2006 to five counts of taking indecent liberties with a child. He stipulated to the aggravating factors that the victim was very young and that he abused a position of trust with the victim. Beginning in February and ending in May 2006, defendant Plemmons committed the multiple offenses when he was at least fifty years of age and his victim was a young girl of five to six years of age. Two of the offenses were consolidated for sentencing, and defendant Plemmons received an active term of imprisonment of twenty-four to twenty-nine months. The trial court suspended the remaining sentences and imposed a period of supervised probation.

Defendant Waters pleaded guilty on 12 April 2007 to five counts of taking indecent liberties with a child. At the time of his offenses, which were committed between August and December 2004, defendant Waters was approximately forty years old and his victim was a ten year old girl. The trial court suspended the sentences and imposed a period of supervised probation on defendant Waters.

Defendant Bowditch pleaded guilty on 3 December 2007 to eight counts of taking indecent liberties with a child. From June through August 2006, Bowditch, who was then sixteen years old, committed his offenses against an eight year old victim. After consolidating some of the cases and suspending sentences, the trial court imposed a period of supervised probation on defendant Bowditch.

Upon receiving notice of the State's intention to seek their enrollment in the SBM program, defendants filed separate motions on constitutional grounds to dismiss the State's petitions for satellite-based monitoring. After conducting hearings on 1 May and 28 May 2009, the trial court issued a memorandum and order on 12 June 2009 making numerous findings of fact and concluding as a matter of law that (1) determining whether an offense is aggravated for purposes of imposing lifetime satellite-based monitoring is a fact-based, rather than an element-based, inquiry;[1] (2) the legislature "intended Satellite monitoring to be criminal punishment"; and (3) even if not intended to be punitive, SBM's purpose and effect, when analyzed according to the factors enunciated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), "are so punitive that civil intent is negated." The trial court then ruled that applying SBM to defendants "would be unconstitutional under the *ex post facto* provisions of both the United States and North Carolina Constitutions." As such, the trial court allowed defendants' motions and dismissed the State's petitions. The State gave notice of appeal to the Court of Appeals on 23 June 2009. Defendants then filed a petition with this Court on 27 October 2009 to certify the case for discretionary review prior to determination by the Court of Appeals. This Court allowed defendants' petition on 18 February 2010 to address the significant constitutional question at issue.

## FACTUAL BACKGROUND

After its enactment effective 16 August 2006, the SBM legislation was codified at Part 5 of Article 27A, Chapter 14, of the North Carolina General Statutes. Chapter 14 contains the Criminal Law portion of our statutes, and Article 27A is entitled "Sex Offender and Public Protection Registration Programs." As authorized by the legislation, DOC established and began administering the SBM program on 1 January 2007.

At the hearings conducted on 1 May and 28 May 2009, the trial court heard testimony from three individuals who were employed by DOC in the Division of Community Corrections (DCC). Todd Carter testified about his role as a probation officer assigned to assist with monitoring SBM participants on a local level; Lori Anderson testified as a manager for the Twenty-Eighth Judicial District; and Hannah

---

1. The State assigned error to this conclusion of law, but did not address the issue in its brief. Thus, under the rules of appellate procedure applicable to this case, we consider the assignment of error to be abandoned, and we will not address it. *See* N.C. R. App. P. 28(b)(6).

Roland, who was based in Raleigh, testified as the special operations administrator in charge of the SBM program for sex offenders.

In relevant part, their testimony tended to reflect the following: SBM's enrollment population consists of (1) offenders on parole or probation who are subject to State supervision, (2) unsupervised offenders who remain under SBM by court order for a designated number of months or years, and (3) unsupervised offenders subject to SBM for life, who are also known as "lifetime trackers." *Cf.* N.C.G.S. §§ 14-208.40, -208.40A, -208.40B (describing when SBM is required at all, when it is mandatory "for life," and when it should be imposed "for a period of time to be specified by the court").

All SBM participants receive three items of equipment. First, at all times they wear a transmitter, which is a bracelet held in place by a strap worn around one ankle. Tampering with the bracelet or removing it triggers an alert. The ankle bracelet in use at the time of the hearings was approximately three inches by one and three-quarters inches by one inch. Second, participants wear a miniature tracking device (MTD) around the shoulder or at the waistline on a belt. The MTD may not be hidden under clothing. The device contains the Global Positioning System (GPS) receiver and is tethered to the ankle bracelet by a radio-frequency (RF) signal. The size of the MTD in use at the time of the hearings was four and one-quarter inches by two inches by three inches. The MTD includes an electronic screen that displays text messages communicating possible violations or information to the participant. Third, a base unit is required for charging the MTD's battery, and although it is typically kept at a participant's residence, the base unit may be used to recharge the MTD wherever electricity is available. The MTD requires at least six hours of charging per twenty-four hour period.

Personnel from DCC perform maintenance on the equipment every ninety days and replace the transmitter once a year. This maintenance requires a visit to the location of the base. The maintenance is conducted under an agreement signed by SBM participants when monitoring begins. Criminal liability is imposed for, *inter alia*, refusing to allow the required maintenance, destroying the equipment, or interfering with its proper functioning. N.C.G.S. § 14-208.44(b), (c).

The monitoring aspects of SBM are conducted by DOC/DCC. Personnel in Raleigh monitor unsupervised participants and assist field staff with tracking supervised offenders. Outside of normal

work hours for the personnel in Raleigh, local law enforcement officers are on call to receive and address alerts as necessary.

The equipment facilitates a "near real time" log of a participant's movements. However, only periodic checks are conducted on the movements of unsupervised participants, going back a day or two at a time. If DCC personnel observe certain patterns of movement or locations that a participant appears to frequent, they may contact local officers to identify the area and look for vulnerable sites, such as schools or day-care centers. If reviewing the tracking information reveals a participant's presence at a location that may constitute a violation of North Carolina law, DCC contacts local law enforcement, which may investigate further. Supervised offenders may be subject to "inclusion zones," areas in which they must remain for a period of time, or "exclusion zones," which they must refrain from visiting. No such zones are utilized for unsupervised participants. The tracking information is stored at DOC for one year, and then the program vendor archives the information for the length of the State's contract plus seven years.

The SBM equipment transmits various alerts regarding potential violations to DCC personnel. Alerts that are uploaded "immediately" consist for the most part of alerts indicating "bracelet gone," violations of "inclusion" or "exclusion" zones, or "no GPS" signal. The alert for "bracelet gone" is sent when transmission is lost between the ankle bracelet and the MTD. The loss in transmission may be due to a variety of causes, such as removing the MTD and venturing too far away from it. Equipment in use at the time of the hearings allowed for a range of approximately fifty feet between the MTD and the ankle bracelet, while newer equipment allows for a range of up to thirty feet. The alerts for "inclusion" or "exclusion" zones are triggered when a supervised SBM participant violates the boundaries of an established zone. The "no GPS" alert is triggered when transmission is lost between participants and the satellite that is tracking their movements. SBM participants must acknowledge the alerts and respond to attempts to resolve them.

SBM may affect a participant's daily activities. Entrance into some buildings disrupts the GPS signal, requiring the participant to go outside to reestablish satellite connection. Submerging the ankle bracelet in three feet or more of water generates a "bracelet gone" alert. In terms of travel, the SBM program places no restrictions on unsupervised participants who may leave the state temporarily or permanently after returning the SBM equipment to

DOC. It is possible, though, that the GPS signal may be lost in remote areas, and commercial airplane flight is likely limited due to security regulations.

Nonetheless, testimony indicated that the equipment and DCC can make accommodations according to the needs of SBM participants. At a place of employment, the MTD can be set at a stationary location while the participant moves around, as long as the range of the equipment's signal is not exceeded. If circumstances necessitate going in and out of range, officers know of a participant's employment situation and can confirm via telephone that the participant is at work. Moreover, for certain medical procedures the ankle bracelet can be relocated or removed. If a physician orders a magnetic resonance imaging (MRI) procedure, for example, DCC staff can remove the equipment for the MRI.

## ANALYSIS

An appellate court reviews conclusions of law pertaining to a constitutional matter de novo. *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (citing *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004)). The trial court's findings of fact are binding on appeal if they are " 'supported by competent evidence,' " and they must ultimately support the trial court's conclusions of law. *Id.* (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)).

This Court has considered a number of cases involving various statutory provisions directed at convicted sex offenders. *See, e.g., State v. Abshire*, 363 N.C. 322, 677 S.E.2d 444 (2009) (clarifying the definition of "address" in the registration statutes); *Standley v. Town of Woodfin*, 362 N.C. 328, 661 S.E.2d 728 (2008) (upholding a city ordinance criminalizing knowing entry into public parks by registered sex offenders); *State v. Bryant*, 359 N.C. 554, 614 S.E.2d 479 (2005) (upholding registration statutes as constitutional when applied to a convicted sex offender who moved to North Carolina from another jurisdiction). The case before us is this Court's first opportunity to rule on an aspect of the SBM program.[2]

2. The North Carolina Court of Appeals has already addressed the present issue, stating that the SBM program does not violate ex post facto prohibitions in at least eleven unanimous opinions. *State v. Stewart*, COA09-928, slip op. at 1 (N.C. App. Mar. 2, 2010) (unpublished); *State v. Murdock*, COA09-615, slip op. at 1 (N.C. App. Jan. 19, 2010) (unpublished); *State v. Boothe*, COA09-264, slip op. at 1 (N.C. App. Jan. 5, 2010) (unpublished); *State v. Lederer-Hughes*, COA09-280, slip op. at 1 (N.C. App. Nov. 17, 2009) (unpublished); *State v. Hughes*, COA09-288, slip op. at 1 (N.C. App. Nov. 3, 2009)

The United States and North Carolina Constitutions prohibit ex post facto laws. U.S. Const. art. I, § 10, cl. 1; N.C. Const. art. I, § 16. "An *ex post facto* law may be defined, as relevant here, as a law that 'allows imposition of a different or greater punishment than was permitted when the crime was committed.' " *State v. Barnes*, 345 N.C. 184, 233-34, 481 S.E.2d 44, 71 (1997) (quoting *State v. Vance*, 328 N.C. 613, 620, 403 S.E.2d 495, 500 (1991)), *cert. denied*, 522 U.S. 876 (1998). Under this Court's jurisprudence, "the federal and state constitutional *ex post facto* provisions are evaluated under the same definition." *State v. Wiley*, 355 N.C. 592, 625, 565 S.E.2d 22, 45 (2002) (citing *State v. Robinson*, 335 N.C. 146, 147-48, 436 S.E.2d 125, 126-27 (1993)), *cert. denied*, 537 U.S. 1117 (2003).

In 1997, the Supreme Court of the United States reviewed legislation enacted by Kansas that established "procedures for the civil commitment of persons who, due to a 'mental abnormality' or a 'personality disorder,' are likely to engage in 'predatory acts of sexual violence.' " *Kansas v. Hendricks*, 521 U.S. 346, 350 (1997) (quoting Kan. Stat. Ann. § 59-29a02 (1994)). In 2003, the Court decided *Smith v. Doe*, in which it considered the registration requirements and notification system of Alaska's Sex Offender Registration Act. 538 U.S. 84, 89-90 (2003). The Court held in both *Smith* and *Hendricks* that the statutory measures under review did not violate the Ex Post Facto Clause of the federal constitution. *Smith*, 538 U.S. at 105-06; *Hendricks*, 521 U.S. at 370-71. *Smith* and *Hendricks* are significant because of their explanation of controlling ex post facto law and because of their similar subject matter to the case *sub judice*. As further explained below, many parallels exist between the SBM program at issue and the regulatory schemes analyzed in *Smith* and *Hendricks*. The instant case falls within the framework established by those precedents for civil, regulatory schemes that address the recidivist tendencies of convicted sex offenders.

An ex post facto analysis begins with determining whether the express or implicit "intention of the legislature was to impose pun-

(unpublished); *State v. Miller*, COA09-623, slip op. at 1 (N.C. App. Nov. 3, 2009) (unpublished); *State v. Downey*, —— N.C. App. ——, 683 S.E.2d 791 (2009) (unpublished); *State v. Stines*, —— N.C. App. ——, 683 S.E.2d 411 (2009); *State v. Chandler*, COA08-885, slip op. at 1 (N.C. App. July 21, 2009) (unpublished); *State v. Anderson*, —— N.C. App. —— 679 S.E.2d 165 (2009), and *State v. Bare*, —— N.C. App. ——, 677 S.E.2d 518 (2009). Three other panels at the Court of Appeals have concluded the same, but in divided opinions. *State v. Vogt*, —— N.C. App. ——, 685 S.E.2d 23 (2009) (Elmore, J., dissenting); *State v. Morrow*, —— N.C. App. ——, 683 S.E.2d 754 (2009) (Elmore, J., concurring in part and dissenting in part); *State v. Wagoner*, —— N.C. App. ——, 683 S.E.2d 391 (2009) (Elmore, J., dissenting).

ishment," and if so, "that ends the inquiry." *Smith*, 538 U.S. at 92 (citing *Hendricks*, 521 U.S. at 361). If the intention was to enact a civil, regulatory scheme, then by referring to the factors enunciated in *Kennedy v. Mendoza-Martinez* for guidance, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate" the legislature's civil intent. *Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361) (internal quotation marks omitted).

## The Legislative Objective in Enacting SBM Was Nonpunitive

Our analysis begins with discerning through statutory construction "the legislative objective," *id.* (citing *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)), whether announced " 'expressly' " or indicated " 'impliedly,' " regarding SBM's status as civil regulation or criminal punishment, *id.* at 92-93 (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)). The text, structure, manner of codification, and enforcement procedures of the statutory scheme are a few of the probative indicators of legislative intent. *Id.* at 92-94 (citations omitted). At the outset, we note that the legislature did not expressly attach the label of civil or criminal to the SBM program. Unlike the sex offender registration programs, which are prefaced by an extensive expression of purpose in N.C.G.S. § 14-208.5, the legislature did not enact a separate purpose section specific to SBM. Nonetheless, several indicators demonstrate that the legislative objective in enacting SBM was to establish a nonpunitive, regulatory program.

The legislature's intent in establishing SBM may be inferred from the declaration in the authorizing legislation that it "shall be known as 'An Act To Protect North Carolina's Children/Sex Offender Law Changes.' " Ch. 247, sec. 1(a), 2006 N.C. Sess. Laws at 1066. Desiring to protect our State's children from the recidivist tendencies of convicted sex offenders demonstrates an intent to create a nonpunitive, regulatory scheme. *Cf. Smith*, 538 U.S. at 93 (noting that nonpunitive sex offender registration statutes were designed to protect the public from harm); *Hendricks*, 521 U.S. at 361-63 (noting that involuntary civil commitment of dangerous sex offenders was intended to protect the public).

Furthermore, the placement of the SBM program within Article 27A of Chapter 14 of our General Statutes is significant. The SBM program follows immediately after the Article 27A sections composing the Sex Offender Registration Programs. N.C.G.S. §§ 14-208.5 to

-208.32 (2009). Before enactment of the SBM program, the Supreme Court of the United States had determined sex offender registration statutes to be civil regulations, *Smith*, 538 U.S. at 105-06, and North Carolina appellate courts had reached the same conclusion, *see State v. Sakobie*, 165 N.C. App. 447, 451-52, 598 S.E.2d 615, 617-18 (2004). Moreover, the legislature's statement of purpose for Article 27A, found at section 14-208.5, explains that "the purpose of this Article [is] to assist law enforcement agencies' efforts to protect communities." Understandably, section 14-208.5 explicitly refers to registration, but the SBM program is consistent with that section's express goals of compiling and fostering the "exchange of rele-. vant information" concerning sex offenders. The decision to codify the SBM statutory scheme in the same Article and immediately following the registration programs implies a legislative objective to make the SBM program one part of a broader regulatory means of confronting the unique "threat to public safety posed by the recidivist tendencies of convicted sex offenders." *Abshire*, 363 N.C. at 323, 677 S.E.2d at 446.

Defendants suggest that the SBM program's location in Chapter 14, the "Criminal Law" portion of our General Statutes, is relevant. However, placement in a criminal code is not dispositive. *See, e.g., Smith*, 538 U.S. at 94-95 (stating that codifying a sex offender registration provision in a criminal procedure code was not dispositive of the statute's punitive nature); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364 (1984) (holding that a forfeiture provision for firearms was a civil sanction despite codification of its authorizing statute in a criminal code). We are more persuaded to recognize the legislature's civil intent behind SBM by noting that the program was codified into the previously recognized nonpunitive, regulatory scheme located in Article 27A of Chapter 14.

Another attribute of the SBM program that may be probative of legislative intent is that its administration is overseen by the Division of Community Corrections, which is under the Department of Correction. Even though Hannah Roland testified that in her opinion there were no other DOC programs that were not criminal punishment of some sort, any initial reaction that DOC/DCC's involvement inherently relegates SBM to the domain of criminal punishment is premature.

Among DOC's varied responsibilities and activities are programs "designed to give persons committed to the Department op-

portunities for physical, mental and moral improvement," N.C.G.S. § 148-22(b) (2009), programs for "academic and vocational and technical education," *id.* § 148-22.1(a) (2009), and programs providing "incarcerated offenders a work and training environment that emulates private industry," *id.* § 148-129(1) (2009). Without definitively deciding the nature of these programs, we note that their existence makes the effect of DOC/DCC's involvement in administrating the SBM program at the least, "open to debate." *Cf. Smith,* 538 U.S. at 94-96 (making a similar conclusion as to the enforcement procedures established by Alaska's sex offender registry program). DOC is responsible for the administration of criminal punishment, but not everything DOC handles is therefore punitive. DOC's programs retain the common element of involving accused or convicted criminal offenders, but that all of DOC's activities involve criminal punishment should not be presumed. SBM participants are offenders who, at some point in time and for some duration of time, come under DOC's authority by virtue of their criminal convictions. As a result, utilizing DOC's administrative and personnel resources for the SBM program appears to make sound organizational and fiscal sense. We cannot agree, as defendants argue, that "[h]ad the General Assembly intended SBM to be civil, it would have entrusted its creation and supervision to a governmental entity other than DOC."

In sum, the General Assembly described the SBM program as a means "To Protect North Carolina's Children" and codified the SBM provisions in Article 27A of Chapter 14 of our General Statutes. These decisions in particular evince the nonpunitive objective of making SBM another regulatory tool in an effort to defend against an unacceptable threat to public safety.

## Civil Intent Is Not Negated by SBM's Purpose or Effect

Although the legislature sufficiently implied its civil intent in enacting the SBM program, ex post facto jurisprudence compels an analysis of whether SBM is so punitive in purpose or effect that the legislature's civil intent is negated. *See Smith,* 538 U.S. at 92. The " 'useful guideposts,' " *id.* at 97 (quoting *Hudson,* 522 U.S. at 99), for this analysis are factors compiled in *Kennedy v. Mendoza-Martinez.* They are helpful but not necessarily " 'exhaustive' " or " 'dispositive.' " *Id.* at 97 (quoting *United States v. Ward,* 448 U.S. 242, 249 (1980)). As the Court in *Smith* similarly recognized, two of the factors carry "little weight" in this context because SBM applies only to certain offenders based on their past conduct, not to their current

behavior.[3] *See id.* at 105; *Doe v. Bredesen,* 507 F.3d 998, 1004, 1007 (6th Cir. 2007) (relying on *Smith* and noting that the two *Mendoza-Martinez* factors referenced above "were not particularly germane" when testing sex offender registration and SBM statutes for ex post facto concerns), *cert. denied,* ── U.S. ──, 129 S. Ct. 287 (2008). Thus, the following five

> factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

*Smith,* 538 U.S. at 97; *see Mendoza-Martinez,* 372 U.S. at 168-69 (footnotes omitted). The trial court stated that it considered the *Mendoza-Martinez* factors and in its order listed seven points in support of its determination that the factors weigh in favor of negating the legislature's civil intent. While it is not entirely clear which of the trial court's observations correspond to which factors, we will assess some of the trial court's observations and defendants' arguments as we undertake a de novo review of the issue.

As outlined in *Smith,* addressing the first relevant factor entails a discussion of historical or traditional methods of punishment. The technology behind SBM is relatively new, and in that sense, it has no history or tradition of being used for punishment. As such, a meaningful discussion requires an attempt at drawing analogies. The trial court concluded that traditional criminal punishments and SBM share the aspects of "supervision by the State" and "[s]hame and humiliation by wearing a readily identifiable mechanism in public." Defendants also argue that relevant here are the trial court's references to SBM as being similar to electronic house arrest and to a defendant's ability to free himself of SBM by leaving the state permanently.

An offender's period of parole or probation, and its attendant State supervision, historically have been considered a form of crimi-

---

3. The two factors of only "little weight," *Smith,* 538 U.S. at 105, are "whether [the scheme] comes into play only on a finding of *scienter*" and "whether the behavior to which it applies is already a crime." *Mendoza-Martinez,* 372 U.S. at 168 (footnotes omitted). These factors are inconsequential in this setting because, similar to the sex offender registration law at issue in *Smith,* the SBM program applies only to individuals who have committed crimes *in the past.* SBM applies to individuals based on prior behavior, and its concern is with recidivist tendencies. *See Smith,* 538 U.S. at 105.

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

nal punishment. *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987). There is a level of monitoring that takes place in the SBM program; however, the difference here is that SBM's "surveillance components are not of a type that we have traditionally considered as a punishment." *See Bredesen*, 507 F.3d at 1005. DCC considers some SBM participants to be supervised but that terminology is used because those offenders are concurrently serving a period of parole or probation. DCC considers other SBM participants who are no longer on parole or probation to be unsupervised. The movements of unsupervised SBM participants are only periodically checked for observable patterns or proximity to sensitive locations. Consistent with the terms of their probation, supervised offenders may be subject to "inclusion zones" or "exclusion zones," but no such zones are utilized for unsupervised participants.

The monitoring taking place in the SBM program is far more passive and is distinguishable from the type of State supervision imposed on probationers, who must live under a regime of " 'conditional liberty properly dependent on observance of special [probation] restrictions.' " *Griffin*, 483 U.S. at 874 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972) (alteration in original)); *see also Smith*, 538 U.S. at 101 ("Probation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release . . . ." (citations omitted)). Through the SBM program the State is logging and reviewing information about offenders' whereabouts. Hannah Roland explained DCC's approach to the "lifetime trackers," stating "[A]ll we're doing is tracking them. We're not technically supervising them. As the law stipulates, they are unsupervised." Even the requirement that DCC personnel be allowed to enter a participant's residence every ninety days is dissimilar from a parole or probation setting. DCC's reason for the visit is not supervisory or investigatory; the only purpose is to perform regularly scheduled maintenance on the SBM equipment that is still property of the State.

Furthermore, likening the SBM program more to house arrest than to sex offender registration is unavailing. Defendants argue that "DOC has the power" to establish and limit an inclusion zone "to the offender's residence, thereby turning the home into a prison cell." However, there is no evidence that exclusion or inclusion zones have been utilized for unsupervised SBM participants. Hannah Roland was asked by defense counsel at one point about the zones: "But they could be utilized; is that correct?" and her answer was "No." Her tes-

timony reflects that inclusion or exclusion zones are used for participants on supervised probation as an aid to compliance with their *probation* restrictions. For instance, an individual on probation may be ordered to attend a treatment center. Through an inclusion zone around the treatment center at the appropriate times, SBM may facilitate the probation officer's knowledge of whether the individual attended the treatment session. Utilizing SBM as a tool in this capacity does not make it a punishment.

As additional support for the house arrest argument, defendants note that the MTD's battery requires recharging for six hours during every twenty-four hour period. This ties the SBM participant for the charging period to the location of the base unit, which is most likely the participant's residence. However, this feature of the SBM equipment can be distinguished from a house arrest situation because the MTD's battery can be charged wherever electricity is available. In this day and age, finding a source of available electricity, whether at a home, hotel, place of employment, or even in a moving vehicle, should be little or no challenge.

Next, defendants argue that SBM is similar in form to historical punishments involving shaming and humiliation because the ankle bracelet and MTD must be worn in a conspicuous manner that is thus visible in public. The Court in *Smith* noted how historically there have been certain punishments intended to "inflict public disgrace," such as ordering convicted offenders " 'to stand in public with signs cataloguing their offenses.' " 538 U.S. at 97 (quoting Adam J. Hirsch, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts*, 80 Mich. L. Rev. 1179, 1226 (1982)). There is a dispositive difference between these historical types of shaming punishments and SBM. An integral dynamic of a shaming punishment is the State's purposeful arrangement of a "face-to-face" display of the offender in front of fellow citizens for public disgrace and ridicule. *Id.* at 98. With SBM the State's objective is not to publicize crimes and bring a "resulting stigma" on the offender. *See id.* at 99. Any humiliation from enrollment in SBM is unintended by the State.

There is no evidence in the record that any sex offender has faced personal embarrassment or social ostracism because of wearing the SBM equipment in public, nor is there any evidence that a casual public observer has even recognized the SBM equipment and identified its wearer as a convicted sex offender. We are persuaded by the observation of the court in *Doe v. Bredesen*, which concluded that Tennessee's SBM equipment was "relatively unobtrusive" and

"[i]n its size, shape, and placement . . . appears very similar to . . . other nondescript electronic device[s]." 507 F.3d at 1005. The MTD used for Tennessee's SBM program under evaluation in *Bredesen* was larger than the MTD in the present case: "6 inches by 3.25 inches by 1.75 inches," *id.*, compared here to 4.25 inches by 2 inches by 3 inches. A casual observer could perceive the MTD to be any number of personal electronic devices, such as a cellular phone, personal digital assistant (PDA), or MP3 player. We cannot conclude that simply mandating the wearing of the SBM equipment in public amounts to a form of criminal punishment.

The final historical means of punishment that defendants attempt to analogize to SBM is that of banishment. There is no dispute that "banishment and exile have throughout history been used as punishment." *Mendoza-Martinez*, 372 U.S. at 168 n.23. Banishment is "[e]xpulsion from" a community. *Black's Law Dictionary* 655 (9th ed. 2009) (defining "exile" and showing "banishment" as a synonym thereof). Here, the argument is unconvincing because SBM expels no one from anywhere. An unsupervised offender subject to SBM is free to leave North Carolina and remove himself from any regulatory scheme imposed by our State, including SBM, if he so chooses. SBM does not banish anyone, and neither is leaving the state the only means of removal from the SBM program. *See* N.C.G.S. § 14-208.43 (enabling sex offender on lifetime SBM to petition for removal upon meeting certain conditions).

The second relevant *Mendoza-Martinez* factor is whether SBM imposes an affirmative disability or restraint on its participants and if so, to what extent. This requires a consideration of "how the effects of [SBM] are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Smith*, 538 U.S. at 99-100.

There is no denying that being subjected to SBM has an impact on the lives of its participants. Yet, when viewed in light of other civil, regulatory schemes, we cannot conclude that the effects of SBM transform it into criminal punishment. While considering an ex post facto challenge to a sex offender registration scheme in *Smith*, the Court commented that registration "obligations are *less harsh* than the sanctions of occupational debarment, which [] have [been] held to be nonpunitive." *Id.* at 100 (emphasis added) (citing *Hudson*, 522 U.S. at 104 (forbidding work in the banking industry); *De Veau v. Braisted*, 363 U.S. 144 (1960) (forbidding work as a union official); *Hawker v. New York*, 170 U.S. 189 (1898) (revoking medical license));

*see also Bredesen*, 507 F.3d at 1005 (relying on *Smith* to conclude that the effects of Tennessee's SBM program were less harsh than occupational debarment). Occupational debarment is far more harsh than an SBM program that allows offenders to choose where they work and what type of occupation they pursue. Hannah Roland testified that DCC makes efforts to accommodate the employment requirements of SBM participants, when necessary. She further stated regarding employment situations that DCC attempts "to work with [offenders] and get their cooperation to make it as easy and frustrating-free as possible." There is no indication in the record that any SBM participant has been unable to pursue a desired occupation due to SBM. *Cf. Smith*, 538 U.S. at 100 (noting the absence of record evidence showing any "substantial occupational or housing disadvantages" due to sex offender registration).

The effects of the present SBM program are also less harsh than the post-incarceration, involuntarily confinement of sex offenders that was found to be nonpunitive in *Kansas v. Hendricks*, 521 U.S. 346 (1997). In *Hendricks* the Court acknowledged that the civil commitment scheme involved "an affirmative restraint," but noted that even detainment " 'does not inexorably lead to the conclusion that the government has imposed punishment.' " *Id.* at 363 (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)). The SBM program does not detain an offender in any significant way. Defendants point out that the SBM program requires participants to acknowledge messages sent via the MTD and cooperate with DCC in resolving alerts. Additionally, every ninety days a participant must allow DCC personnel to perform maintenance on the SBM equipment where it is located, typically in the participant's residence. While these requirements of the SBM program, and others, constrain a participant's experience of absolute freedom, no aspect of the SBM program remotely approaches the same level of restraint as the detainment inherent in the civil commitment scheme upheld in *Hendricks*. Similar to registration schemes, the requirements necessary to operate SBM "make a valid regulatory program effective and do not impose punitive restraints." *Smith*, 538 U.S. at 102.

Noting the maintenance that must be performed by DCC personnel every ninety days, typically within an offender's residence, the dissenting opinion argues that the SBM program unnecessarily burdens the Fourth Amendment rights of those convicted felons subject to SBM. However, it is beyond dispute that convicted felons do not enjoy the same measure of constitutional protections, including the

expectation of privacy under the Fourth Amendment, as do citizens who have not been convicted of a felony. *See, e.g., Velasquez v. Woods*, 329 F.3d 420 (5th Cir. 2003) (per curiam) (holding that collecting blood samples from felons for registration in a DNA databank does not violate the Fourth Amendment); *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir. 1997) (holding that convicted sex offenders have no right of privacy preventing a state from requiring them to register as such and be subject to community notification of their residences), *cert. denied*, 523 U.S. 1007 (1998); *Jones v. Murray*, 962 F.2d 302, 306 (4th Cir. 1992) ("Even probationers lose the protection of the Fourth Amendment with respect to their right to privacy against searches of their homes pursuant to an established program to ensure rehabilitation and security." (citing *Griffin*, 483 U.S. at 868)), *cert. denied*, 506 U.S. 977 (1992); *Standley*, 362 N.C. at 329-33, 661 S.E.2d at 730-32 (holding that a convicted sex offender's constitutional rights were not violated by a municipal ordinance that prohibited him from access to public parks); *Bryant*, 359 N.C. at 557-70, 614 S.E.2d at 481-89 (holding that no due process violation occurred when a convicted sex offender who was required to register in South Carolina failed to register in North Carolina, even though he received no actual notice of registration requirement). Here felons convicted of multiple counts of indecent liberties with children are not visited by DCC personnel for random searches, but simply to ensure the SBM system is working properly.

Finally, in regards to the second factor, defendants list an array of activities that SBM may prohibit or render more difficult. Examples include bathing, swimming, scuba diving, camping in rural areas, and travel by airplane. Moreover, any activity conducted inside a building potentially could be interrupted if the building's structure blocked the satellite signal and required a participant to exit and reestablish satellite connection. These are not trivial interferences, yet they are certainly no more onerous than the harsh effects of the regulations found to be nonpunitive in occupational debarment cases or in *Hendricks*.

*Doe v. Bredesen* is likewise persuasive on this point. The court in that case considered record testimony from an offender enrolled in Tennessee's SBM program. He described his experiences of not being allowed to swim or bathe, of needing to go outside a building "at least once every hour so that monitoring can take place," and of one time "stand[ing] in the rain, for over thirty minutes, for all his neighbors to see" while a problem with the equipment was corrected. *Bredesen*,

507 F.3d at 1002. Still, the court in *Bredesen* could not conclude that these circumstances rendered Tennessee's SBM program punitive.

The next relevant factor is whether the SBM program promotes the traditional aims of punishment. Retribution and deterrence are "the two primary objectives of criminal punishment." *Hendricks*, 521 U.S. at 361-62. Defendants argue that SBM is retributive because it applies only to individuals who have been convicted of prior criminal behavior. In *Hendricks* the Court noted that under Kansas law, even "persons absolved of criminal responsibility may nonetheless be subject to confinement." *Id.* at 362 (citation omitted). The Court commented that the "absence of the necessary criminal responsibility suggests that the State [was] not seeking retribution for a past misdeed." *Id.* We do not find this language dispositive, though, in light of *Smith*, which did not conclude that Alaska's sex offender registration scheme was retributive even though registration "applie[d] only to past conduct, which was, and is, a crime." 538 U.S. at 102, 105. The SBM program is concerned with protecting the public against recidivist tendencies of convicted sex offenders. Thus, the fact that it applies only to individuals convicted of prior criminal conduct is consistent with its regulatory purpose and not indicative of a retributive nature.

Both the State and defendants acknowledge that SBM may have a deterrent purpose or effect in some measure. "But the mere presence of this purpose is insufficient to render a sanction criminal . . . ." *Hudson*, 522 U.S. at 105 (citations omitted). As the Court recognized in *Smith*, "[a]ny number of governmental programs might deter crime without imposing punishment," 538 U.S. at 102, and that is the case here. The SBM program's foremost purpose is not to deter crime, and the possibility of having that secondary effect does not transform SBM into a form of punishment.

The fourth relevant factor is whether SBM has a rational connection to a nonpunitive purpose. The Court in *Smith* identified this indicator as "a '[m]ost significant' factor in [its] determination." *Id.* at 102 (emphasis added) (quoting *United States v. Ursery*, 518 U.S. 267, 290 (1996) (alteration in original)). Both the State and defendants recognize a rational connection between SBM and the nonpunitive purpose of protecting the public.

The fifth and final relevant *Mendoza-Martinez* factor is whether SBM is excessive with respect to its nonpunitive purpose of public safety. This inquiry "is not an exercise in determining whether the

legislature has made the best choice possible to address the problem" but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Id.* at 105. The risk of recidivism posed by sex offenders has been widely documented and is well established. *See Standley,* 362 N.C. at 333, 661 S.E.2d at 731 (discussing the high recidivism rates among sex offenders); *see also McKune v. Lile,* 536 U.S. 24, 32-34 (2002) (plurality) (describing sex offender recidivism rates as "frightening and high"). The SBM program at issue is reasonable when compared to the unacceptable risk against which it seeks to protect.

Moreover, SBM's reasonableness is supported by its limited application and its potentially limited duration. Only three classifications of offenders qualify for SBM according to N.C.G.S. § 14-208.40(a). The legislature viewed these categories of offenders as posing a particular risk to society. It is not excessive to legislate with respect to these types of sex offenders "as a class, rather than require individual determination of their dangerousness." *Smith,* 538 U.S. at 104. Individual determinations can be made though under N.C.G.S. § 14-208.43 if an offender on lifetime SBM petitions the North Carolina Post-Release Supervision and Parole Commission for removal from the SBM program, subject to meeting certain conditions.[4] The possibility of removal from the SBM program following a determination that the "person is not likely to pose a threat to the safety of others" adds to the reasonableness of the SBM program. N.C.G.S. § 14-208.43(c).

## CONCLUSION

The SBM program at issue was enacted with the intent to create a civil, regulatory scheme to protect citizens of our state from the threat posed by the recidivist tendencies of convicted sex offenders. Having examined the relevant *Mendoza-Martinez* factors in detail, we conclude that neither the purpose nor effect of the SBM program negates the legislature's civil intent. Accordingly, subjecting defendants to the SBM program does not violate the Ex Post Facto Clauses of the state or federal constitution. The trial court is reversed, and this case is remanded to that court for further proceedings consistent with this opinion.

---

4. Section 14-208.43(e) does not permit consideration of a request to terminate participation of an offender subjected to SBM under section 14-208.40(a)(2). This provision does not detract from our conclusion, however, because section 14-208.40(a)(2) itself requires an individualized assessment before applying SBM to an offender whose risk level "requires the highest possible level of supervision and monitoring."

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

REVERSED AND REMANDED.

Justice HUDSON dissenting.

Sexual offenses are among the most disturbing and damaging of all crimes, and certainly the public supports the General Assembly's efforts to ensure that victims, both past and potential, are protected from such harm. We all agree that innovative approaches are especially necessary to minimize, if not remove, any contact between vulnerable children and those who would prey on them. My review of the record here, however, reveals that the satellite-based monitoring (SBM) program as implemented through the Department of Correction has marginal, if any, efficacy in accomplishing that important purpose. As such, I conclude that its substantial interferences into the daily lives of those monitored are too punitive in effect to be imposed retroactively on these petitioners. I would therefore reverse the Court of Appeals and affirm the trial court's order.

I agree with the majority opinion that nothing on the face of the statutes in question, N.C.G.S. §§ 14-208.40 to -208.45 (2009), indicates that the General Assembly intended the SBM program as a criminal punishment rather than as a civil regulatory scheme for monitoring sex offenders. Likewise, I recognize that the General Assembly enacted the SBM program "to protect our State's children from the recidivist tendencies of convicted sex offenders," specifically those found guilty of aggravated offenses or determined to be sexually violent predators. However, my analysis of the factors laid out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 9 L. Ed. 2d 644, 660-61 (1963), compels the conclusion that the DOC's implementation has transformed this SBM program from regulatory to punitive in its effects on the liberty interests of these defendants.

When we properly apply *Mendoza-Martinez*, by giving heavy weight to the two key factors, namely, whether the regulatory scheme "has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose," *Smith v. Doe*, 538 U.S. 84, 97, 155 L. Ed. 2d 164, 180 (2003), I must conclude this program is punitive in effect. Indeed, the United States Supreme Court has emphasized that "[t]he Act's rational connection to a nonpunitive purpose is a most significant factor in our determination that the statute's effects are not punitive," while noting that even "imprecision" or a "lack[] [of] a close or perfect fit" between a statute and its nonpunitive aims does not mean the stated purpose is a "sham or mere pretext." *Id.* at 102-03, 155 L. Ed. 2d at 183 (citations, internal quotation

marks, and alteration omitted). Certainly, a program that affirmatively restrains an enrollee's liberty—indeed, even one authorizing the involuntary commitment of an individual to an institution—may be found to be nonpunitive if the action at issue advances the program's regulatory purpose. *See Kansas v. Hendricks*, 521 U.S. 346, 370-71, 138 L. Ed. 2d 501, 516 (1997) (upholding a statute that provides for the involuntary civil commitment of sexually violent predators who are determined to suffer from a "mental abnormality" or "personality disorder"). A review of the transcripts and exhibits here shows that this program does not protect the public in any effective way. In light of its lack of effectiveness, the SBM program at issue here is so excessively restraining and intrusive that it becomes punitive.

As to this "most significant factor" from *Mendoza-Martinez*, the majority merely recites the State's assertion of a "rational connection between SBM and the nonpunitive purpose of protecting the public." Nowhere does the majority opinion—or even the State, in its brief and arguments to this Court or in the hearing before the trial court—articulate how the SBM program, as currently implemented by the DOC through the Division of Community Corrections (DCC), even begins to further its stated purpose of protecting our State's children. Likewise, the majority opinion refers to the risk of recidivism by these offenders and concludes, without any evidence or additional analysis, that "[t]he SBM program at issue is reasonable when compared to the unacceptable risk against which it seeks to protect."[5]

Indeed, the trial court returned to this question repeatedly at the hearing, particularly the statements by DCC personnel that inclusion and exclusion zones are not used as part of the program:

5. The State did not submit any evidence or data to support the assertion that sex offenders are more recidivist than other criminals. In fact, several reputable sources, including North Carolina's own Sexual Offender Accountability and Responsibility (SOAR) program, identify this notion as one of the top "myths" concerning sex offenders, although the data are somewhat murky. *See* SOAR Program Presentation, Conference of North Carolina Superior Court Judges (June 14, 2006), http://www.sog.unc.edu/faculty/smithjess/200606conference/200606CarboStat.doc (listing a series of "Myths," including: "Sex offenders have the highest recidivism rates of all criminals."); Melissa D. Grady, *Sex Offender Myths: Fact or Fiction: What do we know about sex offenders and how to prevent sex crimes?* [hereinafter *Sex Offender Myths*], http://www.preventchildabusenc.org/wp-content/uploads/2009/06/ October-Sex-Offender-Myths_Final1.pdf ("Myth #8: Most sex offenders reoffend," but in reality, "the rate varies depending on the types of crimes or the types of victims an offender targets"; "Myth #5: Current laws . . . have been effective in reducing the number of sex crimes committed," but actually, "nearly 96% of all sex crimes are committed by first-time offenders." (emphases omitted)).

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

COURT: Why monitor somebody if you can't exclude them from going to places you don't want them to go?

[Todd Carter]: I think part of the problem is like an urban—like Asheville, North Carolina, we have a lot of schools. If somebody's going up Merrimon Avenue—

COURT: I understand the difficulties of it. The question is what benefit is the state getting from this knowing where the defendants are if there are no places that are excluded that they can't go? There must be some purpose to doing this, I assume.

[Todd Carter]: Yes, your Honor. I think why they don't do that is they would get so many false readings.

COURT: I understand that, but why do they? Why do they monitor people at all? Or do you know?

[Todd Carter]: I guess part of it is because it's the law and policy handed down.

Again, when Lori Anderson was testifying:

COURT: But there's nothing by regulation or statute that would stop somebody who's done with all this but still under satellite monitoring from going into a school or park other than Woodfin and other things like that?

A: Not that I'm aware of.

Similarly, Hannah Roland affirmed that, with respect to "unsupervised" offenders, who are no longer on any type of post-release parole or probation, "They are not under any type of supervision, so we don't want to appear to be supervising them. It's a periodic check." Ms. Roland attributed this effort not "to appear to be supervising them" to advice that DOC and DCC had received from their legal counsel.

This testimony calls into serious question the efficacy of the SBM program as currently implemented without the use of inclusion and exclusion zones. Although, as the Supreme Court stated in *Smith*, a regulatory scheme need not be "the best choice possible to address the problem," 538 U.S. at 105, 155 L. Ed. 2d at 185, courts have repeatedly emphasized the need for some showing that the program does, in fact, advance the stated nonpunitive purpose. *See, e.g., id.* at 102-03, 155 L. Ed. 2d at 183 (observing that the sex offender registry statute in question "has a legitimate nonpunitive purpose of 'public

safety, *which is advanced by alerting the public to the risk of sex offenders in their communit[y]*' "); *Hendricks*, 521 U.S. at 363, 138 L. Ed. 2d at 516 ("Far from any punitive objective, the confinement's duration is instead linked to the stated purposes of the commitment, namely, *to hold the person until his mental abnormality no longer causes him to be a threat to others.*" (citation omitted) (emphasis added)); *Wallace v. State*, 905 N.E.2d 371, 383 (Ind. 2009) (considering whether the registration statute in question, initially enacted as a measure "to give the community notification necessary to protect its children from sex offenders," "*advances* a legitimate purpose of public safety" or establishes a framework that is a "legitimate way to protect the public from repeat offenders" (emphasis added)); *State v. Letalien*, 2009 ME 130, ¶ 54, 985 A.2d 4, 24 (2009) (emphasizing the "positive benefit" of the "over-inclusive aspect of the registration requirement" because "the public has ready access to information for a longer period regarding a group of individuals who, at least as a class of persons, pose a public safety risk"); *see also* Erin Murphy, *Paradigms of Restraint*, 57 Duke L.J. 1321, 1407 ("[R]ather than rely upon speculative assessments that a particular technology achieves a particular goal, courts should demand evidence of its capacity to achieve its stated purpose.").

Here the majority opinion itself repeatedly downplays the intrusive nature of the SBM program and emphasizes that it is "passive,"[6] that unsupervised enrollees "are only periodically checked," that no enrollees are currently subject to inclusion or exclusion zones (and unsupervised enrollees never will be), and that the State is merely "logging and reviewing information about offenders' whereabouts" after the fact. Most telling, the equipment provides only a "near realtime" log of enrollees' movements, and DCC personnel testified that they do not always immediately respond to all alerts because the equipment so frequently loses signal.

Moreover, Ms. Roland testified that she had a staff of only two probation officers to oversee the seventy people subject to lifetime monitoring as of May 2009. She agreed that "there's a lot of randomness to the monitoring" of the lifetime enrollees. The exhibits submitted by the DOC and DCC, including the "agreements" signed by enrollees, and the testimony at the hearings indicate that the SBM

6. In fact, while the majority uses the word "passive" to characterize the monitoring, the SBM program actually falls under the "active" category of monitoring as defined by the manufacturer of the devices and by the DCC's own Sex Offender Management Interim Policy, because the device provides an immediate notification, or "near real-time reporting," of an alert or violation.

program does not provide any information to the public beyond what is already readily available through the sex offender registry.[7]

Thus, although DOC and DCC may "observe certain patterns of movement or locations that a participant appears to frequent," prompting follow-up investigation to see if the area has any "vulnerable sites, such as schools or daycare centers," no evidence or testimony suggests that the SBM program—with its ongoing interference in and with enrollees' daily lives, even those who have completed all criminal sentences and other post-release supervision—operates to prevent actual harm to our state's children. Of course, the records maintained by the DCC about enrollees' movements and whereabouts may be useful in apprehending a suspect after a crime has already taken place, but the SBM program does nothing to bar enrollees—those at high risk of recidivism—from abusing a child anywhere, at any time.[8] Rather, the record before us, particularly the testimony of DCC officials, demonstrates that no one knows when one of these offenders is actually in a school, or near a child care center, or talking to a neighborhood child, or even has a child in his home, before any harm might befall that child.[9] The General As-

---

7. The sex offender registry allows members of the public to take steps to protect themselves, for example, by researching the publicly available list if they have doubts about a caregiver, coach, or neighbor. The SBM program does not involve any such release of information or provide additional means for the public to avoid these offenders found to be at high risk of recidivism, aside from their possible identification through the ankle bracelet and MTD—yet the majority opinion notes that these devices "could [be] perceive[d] to be any number of personal electronic devices" and thus essentially do nothing to alert the public that a dangerous sex offender is in their midst.

8. Even worse, the SBM program may provide a false sense of security in this regard, as another common myth about sex offenders is that they are strangers to the victims. *See Sex Offender Myths.* According to this report,

[N]early 97% of all sexual crimes against children under the age of 5 are committed by either a relative (48.6%) or someone the victim knows (48.3%) and for children ages 6 to 11 who were sexually assaulted, 42% of their perpetrators were relatives and 52.9% were acquaintances. Those percentages only begin to change slightly with age, with studies showing that as individuals get older, they are more likely to be assaulted by a stranger.

*Id.* (internal citations omitted). For that reason, Grady concludes that "[c]urrent laws . . . do nothing to protect the nearly half of child sexual crime victims who are living in the same home as their perpetrator." *Id.* The SBM program does nothing to mitigate these real risks.

9. Todd Carter testified that "they can go wherever they want to," and Lori Anderson stated she was not aware of anything preventing someone under SBM from going into a school or park. Hannah Roland also confirmed that there is no immediate alert if a lifetime tracker goes within three hundred feet of a school. *But see* Act of July

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

sembly may have intended the SBM program to further the nonpunitive purpose of protecting our children, but the evidence presented here simply does not show that the program's current implementation, without the use of inclusion or exclusion zones, bears any rational connection to that purpose, beyond conclusory statements claiming a link.

Given that the program as implemented essentially fails in its nonpunitive purpose, the numerous affirmative restraints and intrusions it imposes on its enrollees become, in my view, punitive in effect. These intrusions include the following, found as fact by the trial court and unchallenged by the State, which are binding on this Court on appeal:

7. Generally persons who have completed probation are not subject to supervision by the State. Persons who were not on probation who are subject to satellite based monitoring are subject to supervision by the State in the following ways:

   A. If they are in a building and there is a break in contact with the satellite they are ordered to remove themselves from the building until the satellite contact is reconnected.

   B. Every 90 days the satellite monitoring equipment in the possession of the Defendant must be checked by a probation officer.

   C. Employees of the State are at all times capable of determining the geographical location of the Defendant.

   . . . .

   E. Defendants are unable to go swimming or in a hot tub. If it were to become necessary for purposes of physical therapy that the Defendant receive whirlpool therapy or ther-

---

18, 2008, ch. 117, sec. 12, 2008 N.C. Sess. Laws 426, 432 (the "Jessica Lunsford Act," providing in part that registered sex offenders are prohibited from knowingly being "[o]n the premises of any place intended primarily for the use, care, or supervision of minors, including, but not limited to, schools, children's museums, child care centers, nurseries, and playgrounds" with limited exceptions).

Tragically, law enforcement authorities in at least one other state have been forced to confront this very problem. *See* Eliott C. McLaughlin & Patrick Oppmann, *Sex offender kills teen while under GPS monitoring, police say*, CNN.com (Mar. 12, 2009), http://articles.cnn.com/2009-03-12/justice/sex.offender.gps_1_gps-monitoring-offender-death-penalty-arguments?_s=PM:CRIME (recounting the story of a thirteen-year-old Washington State girl killed in a field by a sex offender wearing a GPS monitoring device).

apy within a swimming pool it would be necessary on each occasion for the Defendant to have the probation officer remove the bracelet and reattach it after the therapy was complete. The same would be true with MRI's or other medical devices.

F. Because the equipment cannot pass security, the Defendants could not fly on a commercial airline. Because the equipment is on constantly and would interfere with important radio transmissions Defendants would not be able to fly on private airplanes.

G. At least once a day for a 4 to 6 hour period the MTD must be recharged in a device which is attached to an electrical outlet and the Defendant must remain in the vicinity of that device for the whole period of recharging.

H. While the Defendant is within the purview of the public the MTD must be worn by the Defendant on a place that is open and in plain view of everyone. The MTD is approximately 4¼ inches x 2 inches x 3 inches for the current MTD. The new MTD to be put in use by the State is of slightly different dimensions. Therefore, anyone of the public who knew what the equipment was would know that the Defendant had been convicted or pled guilty to a sex offense. The MTD may not be covered with clothing or anything else.

In a finding of fact challenged by the State, the trial court further found that:

D. Each Defendant must wear on their ankle a plainly visible bracelet and must be within two or three feet of a miniature tracking device (hereinafter called MTD) (the one exception to this is that if the MTD is placed in a stable position such as on a table the State would only be notified if the Defendant was more than 30 feet from the MTD which the State is going to use within the next 60 days [within 50 feet with the MTD currently used]) (the 30 feet or 50 feet above stated might be a smaller distance depending upon the configuration of the walls of a building in which the Defendant may be present). As a practical matter the Court finds that the limitations thus stated severely limits [sic] the Defendant's ability to be present in certain types

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

of buildings; as an example: If a Defendant attended a movie in a modern, multiplex theater it would be necessary for the Defendant to place the MTD on a stable surface in order to avoid the State notifying him that he must constantly leave the building. However, if the Defendant found it necessary to go more than 30 feet away from the MTD to purchase a refreshment, go to the restroom or for some other purpose the connection would be broken and it would be necessary for him to leave the theater until the connection was reconnected and therefore in all probability to purchase a new ticket to complete viewing the movie or to explain the circumstances to the movie personnel. The net result of this would be that the Defendant would not be able to go to a movie in a multiplex theater. Likewise, it would be impractical for Defendants to maintain employment that required them to be within a building and to move more than 30 feet from a fixed position.

This finding is based in large part on testimony offered by DCC personnel tasked by the DOC with implementation of the SBM program, much of which is recited by the majority opinion. As the testimony easily meets our standard of "competent evidence," *State v. Williams*, 362 N.C. 628, 632, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted), it should likewise be binding on this Court.

The majority concedes that the SBM program "may render more difficult or prohibit" activities including "bathing, swimming, scuba diving, camping in rural areas, and travel by airplane," yet concludes that these "interferences" are nonpunitive when compared to the restrictions at issue "in occupational debarment cases or in [*Kansas v.*] *Hendricks*."[10] However, this analogy is false, as it misapplies the analytical framework outlined by the Supreme Court in *Mendoza-Martinez* and *Smith*. In those cases, as *Hendricks*, the Supreme Court evaluated each factor individually—noting, for example, that the civil commitment scheme in *Hendricks* "*does involve an affirmative restraint*," 521 U.S. at 363, 138 L. Ed. 2d at 516 (emphasis

---

10. The Supreme Court did not explicitly apply the *Mendoza-Martinez* factors in *Hendricks* and in fact found that the statute there had no retroactive application. In *Hendricks* eligibility for involuntary confinement was predicated on an additional finding, separate and apart from the underlying conviction, that the individual currently suffers from a "mental abnormality" or "personality disorder" and is likely to pose a future danger to the public. 521 U.S. at 371, 138 L. Ed. 2d at 520. Here, enrollment is based solely on the prior conviction and the details of that offense.

**STATE v. BOWDITCH**

[364 N.C. 335 (2010)]

added)—but nevertheless concluded that the factors taken *together* did not transform a regulatory scheme into a punitive one.[11]

The *balance* of the *Mendoza-Martinez* factors should guide courts in determining if a statute's effects are punitive in spite of its stated regulatory intent. Three factors determine the nature of these effects: "whether, in its necessary operation, [it]: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; [or] promotes the traditional aims of punishment." *Smith*, 538 U.S. at 97, 155 L. Ed. 2d at 180. Again, from the DCC testimony offered at the hearings and the findings of fact binding on this Court on appeal, the trial court's conclusion is well supported that the SBM program "is much more similar to electronic house arrest than it is to registration particularly in that sex registration does not require monitoring by anyone nor does it require a waiver of 4th Amendment rights where electronic house arrest implicitly or impliedly includes both."

Taken together, the findings of fact and the DCC testimony clearly demonstrate that both supervised and unsupervised enrollees in the SBM program are subject to regular, intrusive disruptions in their lives by the State. Moreover, they are exposed to a distinct likelihood of public shame, humiliation, and ostracism because of the visibility of the equipment.[12] When asked the difference between the

---

11. If one were to engage in such analogies, it would be equally easy to find examples of recent federal court cases that have addressed more technologically advanced attempts to monitor sex offenders and their activities that also do not involve occupational debarment or confinement and have concluded that such regulatory schemes are punitive and may not be retroactively applied. *See, e.g., Doe v. Nebraska*, No. 8:09CV456, 2009 WL 5184328, at *8 (D. Neb. Dec. 30, 2009) (barring the State of Nebraska from the retroactive application of "probation-like" statutes requiring consent to search and allow installation of monitoring hardware and software and making it a crime to use Internet social networking sites accessible by minors for persons who have been convicted of sex offenses but who have completed their criminal sentences and who are not on probation, parole, or court-ordered supervision); *Doe v. Prosecutor, Marion Cty., Ind.*, 566 F. Supp. 2d 862, 865, 882-83 (S.D. Ind. 2008) (finding punitive in effect a new requirement that sex offenders no longer subject to State supervision "must also consent to the search of their personal computers or devices with internet capability at any time, and they must consent to installation on the same devices . . . of hardware or software to monitor their internet use," as this "unconstitutional chilling of and intrusion upon plaintiffs' privacy and security at home, and in their papers and effects" is even greater than the requirement to register public information or prohibitions against working in a particular profession).

12. In a dissent from the Sixth Circuit's denial of the defendant's petition for rehearing en banc regarding the retroactive application of satellite-based monitoring in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), *cert. denied*, —— U.S. —— 172 L. Ed. 2d 210 (2008), six judges on that court characterized the GPS device used there as "a cat-

restrictions for home confinement (house arrest) and those for the SBM program, Todd Carter answered that the two are "pretty much fairly similar."[13] While it is strictly true that the SBM program "allows offenders to choose where they work and what type of occupation they pursue," this assertion by the majority opinion ignores the practical reality presented by the technological limitations of the ankle bracelet and the MTD device.

Enrollees are constrained in the type of jobs they may hold; even if the DCC maintains that its staff "attempts 'to work with [offenders] and get their cooperation to make it as easy and frustrating-free as possible,' " such assistance is entirely at the discretion of DCC personnel. In fact, Hannah Roland testified that there are "no written guidelines" on "whether or not an offender can be worked with [regarding] a particular job they have" and such decisions are in the

---

alyst for public ridicule . . . a form of shaming, humiliation, and banishment, which are well-recognized historical forms of punishment." 521 F.3d 680, 681 (6th Cir. 2008) (citations omitted). They further concluded that the program is "excessive in forcing [the defendant] to broadcast his sex offender status not only to those who choose to inquire, but also to the general public" and decried that "[t]he majority, in upholding the Surveillance Act, deliberately turned a blind eye to the obvious effects of forcing [the defendant] to wear such a large box on his person." *Id.*

13. Electronic monitoring, or electronic house arrest, in North Carolina has been described as "involv[ing] the use of electronic equipment to ensure that a person remains in his or her residence or some other place during specific periods. . . . As a condition of adult criminal probation, electronic monitoring now qualifies as an intermediate punishment . . . ." Stevens H. Clarke, *Law of Sentencing, Probation, and Parole in North Carolina* 13 (Inst. of Gov't, Chapel Hill, N.C., 2d ed. 1997). More specifically,

> In the system usually used in North Carolina, the monitoring device is a transmitter attached to the probationer's ankle. The transmitter has a battery life of approximately ninety days. It transmits a continuous signal to a receiver that is installed in the probationer's home, plugged into the electric power and telephone lines. As long as the probationer is within range of the receiver, the system is passive. If the probationer steps beyond the transmitter's range, the receiver initiates a call from the probationer's home over existing telephone lines to a host computer located in the Department of Correction's monitoring center in Raleigh. The computer then records the date and the exact time that the signal was absent from the offender's transmitter. When the receiver obtains a signal from the transmitter indicating that the offender is again within range, another call is made to the host computer indicating the time that the signal resumed. In addition to active calls, the system makes routine calls approximately every four hours to see that the system is operating correctly and that the offender has not tampered with the equipment. The system operates at all hours throughout the period of electronic house arrest.

*Id.* (citing N.C.G.S. § 15A-1340.11(4), (6)(d) (1996); N.C. Dep't of Corr., Div. of Adult Prob. & Parole, *Policies and Procedures* (1996)). Thus, in effect, the current SBM program is electronic house arrest without the use of inclusion and exclusion zones.

discretion of the officer and his or her chief. The written policies make no such allowances, and employers are surely not required to accommodate the need of enrollees to stay within thirty feet of the MTD, take a break to go outside every time an alarm sounds, or have their supervisor confirm to DCC that the enrollee remains at work.

The DCC employees acknowledged both the limitations of the tracking equipment and their susceptibility to disruptive "lost signal" alarms, often triggered when an enrollee is in a building such as one with "a lot of steel." Lori Anderson testified that the "majority types of problems" relate to "the larger the building, the larger the facility, whichever it may be, the farther, deeper that the offender gets into the facility" and conceded that enrollees employed as janitors or parking deck attendants would be likely to encounter issues with the equipment losing its GPS signal. The DCC policy is written such that the MTD cannot be "covered" or "hidden," prohibiting offenders even from "put[ting] [a coat] over" the MTD when "it's cold and winter" or "raining," yet enrollees are required to go outside immediately upon losing a signal and wait until the signal is restored. Todd Carter admitted that he has had "clients" who had to "stand outside in the elements" while waiting to regain a signal, including on holidays and during family gatherings.

Given that the SBM program does not effectively protect our children from prospective harm, its restrictions and infringements on enrollees' liberty interests appear only to be retributive and deterrent in purpose and effect, two traditional aims of punishment.[14] In particular, as found by the trial court, the requirement that enrollees, both supervised and unsupervised, allow DOC employees into their

---

14. The majority maintains that the SBM program's deterrent effect is "secondary" and "does not transform SBM into a form of punishment," yet Steve Chapin, the Chief Executive Officer of Pro Tech Monitoring, the company that provides the equipment for North Carolina's SBM program, has observed that, "*GPS will not prevent a crime. It's a crime deterrent.* It has proven to be a good tool, but you can't oversell it—there's no physical barrier that it creates that can prevent a crime." Randy Dotinga, *Attack of the Perv Trackers*, Wired Magazine (Nov. 9, 2006), *available at* http://www.wired.com/science/discoveries/news/2006/11/72094 (emphasis added). Similarly, a special report by the Pennsylvania Auditor General, whose office surveyed all fifty states regarding their GPS monitoring practices, concluded that "*GPS technology cannot prevent a crime from occurring or show exactly what the offender is doing*, but it can provide critical, verifiable information either to place a sex offender at the scene of a committed crime or to rule the offender out. Moreover, it can serve as a deterrent." Jack Wagner, *Using GPS technology to track sex offenders: Should Pennsylvania do more?*, Special Report, Pa. Dep't of the Auditor Gen. (July 2008), *available at* www.auditorgen.state.pa.us/Reports/Performance/Special/speGPS0721 08.pdf (emphasis added) (bold type omitted).

STATE v. BOWDITCH

[364 N.C. 335 (2010)]

homes for equipment maintenance every ninety days is a clear infringement on their Fourth Amendment rights:

    I. It is required of each Defendant (or the Defendant would be guilty of a Class 1 misdemeanor) that he allow a probation officer or officers access to his residence for purpose of checking and maintaining the equipment and that he therefore waive his 4th Amendment rights.

The SBM program "requirements" form that supervised enrollees must sign, and the "maintenance agreement" that unsupervised enrollees must sign, both provide for this regular maintenance. Both also state that even if an enrollee refuses to sign the agreement, "these requirements are still in effect."

Unlike the majority, I would not characterize these forms as "an agreement signed by SBM participants when monitoring begins." Nor should their acquiescence to this required entry be considered a voluntary waiver of their Fourth Amendment rights, because apparently consent will be implied even if they do not agree, and they are subject to criminal penalties if they refuse. The majority opinion brushes aside these constitutional concerns, maintaining that this requirement is "dissimilar from a parole or probation setting" and acceptable because the purpose is for maintenance on property owned by the State, rather than to supervise or investigate an enrollee. This explanation does not adequately justify such constant intrusion on and monitoring of someone who is not on probation or parole.[15]

---

15. Indeed, the majority opinion's lengthy and numerous citations to cases involving the "lessened" Fourth Amendment rights of convicted sex offenders are both inapposite and unavailing in the context at hand. All the cases cited by the majority opinion involve the *prospective* loss of Fourth Amendment rights by convicted felons; I take no issue with that contention and recognize that it is well supported in the law. Rather, I emphasize again that here, we are concerned with the *retroactive* stripping of the fundamental right to privacy in one's own home. *Cf. Standley v. Town of Woodfin*, 362 N.C. 328, 332, 661 S.E.2d 728, 731 (2008) (observing that the right to travel is not "fundamental" and thus, an ordinance infringing that right need only meet the rational basis test of review).

The sex offender registry cases cited by the majority do not allow the State to enter the convicted offender's home on a regular, warrantless basis, but instead addressed only the right to privacy with respect to dissemination of the offender's name, address, and other identifying information. *Russell v. Gregoire*, 124 F.3d 1079, 1093 (9th Cir. 1997), *cert. denied*, 523 U.S. 1007, 140 L. Ed. 2d 321 (1998); *see also State v. Bryant*, 359 N.C. 554, 568, 614 S.E.2d 479, 488 (2005) (finding that the "defendant had actual notice of his *lifelong duty* to register with the State of South Carolina as a convicted sex offender" and thus, suffered no due process violation).

Furthermore, the majority also relies on cases in which the defendant in question remains in prison. *Velasquez v. Woods*, 329 F.3d 420, 421 (5th Cir. 2003) (per curiam));

## STATE v. BOWDITCH

[364 N.C. 335 (2010)]

Such a casual dismissal of Fourth Amendment rights runs contrary to one of this nation's most cherished ideals: the notion of the right to privacy in our own homes and protection against intrusion by the State into our personal effects and property. *See, e.g., Ker v. California*, 374 U.S. 23, 32, ·10 L. Ed. 2d 726, 737 (1963) ("Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. That safeguard has been declared to be as of the very essence of constitutional liberty the guaranty of which is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen . . . ." (citations and internal quotation marks omitted)); *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34 ("The sanctity of the home is a revered tenet of Anglo-American jurisprudence." (citations omitted)), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987); *State v. Sparrow*, 276 N.C. 499, 512, 173 S.E.2d 897, 906 (1970) (emphasizing "the constitutional principle that a person's home is his castle," "in accordance with the ancient rules of the common law" (citations omitted)). Even sex offenders continue to have some constitutional rights.[16] We may not be fond of this particular class of defendants,

---

*Jones v. Murray*, 962 F.2d 302, 306 (4th Cir.), *cert. denied*, 506 U.S. 977, 121 L. Ed. 2d 378 (1992). By contrast, the SBM program at issue here subjects certain convicted offenders to lifetime tracking and can be applied even after those individuals have paid their debt to society by serving their criminal sentences and completing their terms of parole, probation, or any other court-ordered supervision.

16. As one federal district judge·recently wrote in the context of warrantless searches and monitoring of sex offenders' Internet and computer use, which is less intrusive than governmental entry into a home:

> As heinous as sex and violent crimes are, many other crimes are also threats to our Nation. The social contract reflected in our Constitution imposes limits on law enforcement to protect liberty and privacy. Americans invest a significant portion of public resources to promote social peace and safety. But our founders drew a clear line, based on observed and experienced abuses, on the government's ability to invade fundamentally personal areas. To enter the homes of or to search the personal effects, papers, and bodies of persons in the general population, public officials must have cause to believe that they will find evidence of a crime. It is almost always possible to characterize the Fourth Amendment as an inconvenience to law enforcement officials as they carry out their vital duties. That inconvenience, however, is one of the fundamental protections that separates the United States of America from totalitarian regimes. The right to feel safe and secure in one's own home, person, and belongings is central to our way of life.

*Prosecutor, Marion Cty., Ind.*, 566 F. Supp. 2d at 887 (citations omitted). Likewise, in his dissent from the Sixth Circuit's denial of the defendant's petition for rehearing en banc in *Doe v. Bredesen*, Judge Damon Keith observed, "We must be careful, in our rush to condemn one of the most despicable crimes in our society, not to undermine the freedom and constitutional rights that make our nation great." 521 F.3d at 681.

but that does not lessen their Fourth Amendment rights nor their expectation of privacy in their own homes.

When weighed against its almost complete lack of efficacy in furthering the purpose of protecting our children, the intrusions of the SBM program become punitive in effect. The physical and practical realities of the SBM program—the size and weight of the ankle bracelet and MTD, the requirement to remain in one place for six hours for daily recharging, the degree to which SBM interferes with everyday work and recreation activities, the degree to which the program impedes enrollees' freedom of travel, and its invasive requirement for consent to enter an enrollee's home—transform the effect of the scheme from regulatory to punitive. This is particularly true for those enrollees who are "unsupervised," meaning that they have completed their prison sentences and any post-release supervision ordered by the court.[17] Whereas "supervised" enrollees remain on probation and, as such, are already subject to many of the provisions mandated under the SBM program,[18] "unsupervised" enrollees have fully paid their debt to society yet continue to be monitored by the State, twenty-four hours a day, seven days a week.

Thus, I conclude that, applying the *Mendoza-Martinez* factors, the SBM program is excessively intrusive in light of its minimal efficacy in advancing its nonpunitive purpose. As such, this SBM program is punitive in effect and should not be applied retroactively. I observe, too, that a number of other state supreme courts have reached a similar conclusion, both regarding GPS monitoring as well as more stringent registration requirements for sex offenders that do not implicate the type of Fourth Amendment issues present here. *See, e.g., Wallace,* 905 N.E.2d at 384 (concluding that the sex offender registration scheme "imposes burdens that have the effect of adding punishment beyond that which could have been imposed when [a] crime was committed" and that the program cannot be retroactively applied); *Letalien,* 2009 ME 130, at ¶ 62, 985 A.2d at 26 (finding a life-

---

17. Of course, as convicted sex offenders found to be recidivists, to have committed aggravated offenses, or to be sexually violent predators, even "unsupervised" offenders are still required to maintain lifetime registration on the sex offender registry. As such, unless the offender successfully petitions a court for termination, the public will forever have access to information including the offender's name and identifying features, offense history, home address, a current photograph, and fingerprints. N.C.G.S. §§ 14-208.6A, -208.7, -208.22.

18. For example, probationers are generally subject to curfews and travel restrictions; others may be prohibited from visiting certain locations or spending time anywhere other than home or work.

time registration requirement, including quarterly in-person verification, "without . . . affording those offenders any opportunity to ever be relieved of the duty" to register to be punitive and barring its retroactive application); *Commonwealth v. Cory*, 454 Mass. 559, 572, 911 N.E.2d 187, 197 (2009) (holding that "as a result of the substantial burden on liberty [GPS monitoring] imposes as part of the sentence for certain crimes, the statute is punitive in effect" and therefore may not be applied retroactively to a defendant placed on probation for qualifying sex offenses committed before the statute's effective date); *see also Doe v. Schwarzenegger*, 476 F. Supp. 2d 1178, 1181 (E.D. Cal. 2007) ("[R]eading the [Sexual Predator Punishment and Control Act (SPPCA), which requires, *inter alia*, GPS monitoring of registered sex offenders] retroactively would raise serious ex post facto concerns, and the court is obligated to avoid doing so if it can reasonably construe the statute prospectively."). In other states the legislature has explicitly provided that such statutes have only prospective application. *See, e.g., Burrell v. State*, 993 So.2d 998, 999 (Fla. 2007) (discussing Florida's version of the Jessica Lunsford Act and noting that "[t]he statute specifically states that it applies to sex offenders whose offenses occurred on or after" the statute's effective date).[19]

I conclude only that the retroactive application of these statutes violates the ex post facto clauses of our state and federal constitutions and would therefore prohibit their application solely to those sex offenders who committed their offenses before the effective date of the statute. I respectfully dissent.

Chief Justice PARKER and Justice TIMMONS-GOODSON join in this dissenting opinion.

---

19. Likewise, following the federal district court's ruling in *Doe v. Schwarzenegger*, the State of California declined to appeal, instead stating its agreement that the SPPCA should be applied prospectively only.